UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SOREN NIELSEN and SKYLINE
REPUBLICAN CLUB,

      Plaintiffs,

v.

ANN ARBOR PUBLIC
SCHOOLS, CORY McELMEEL,
individually and in his official
capacity as the principal of
Skyline High School, and
JEFFERSON BILSBORROW,
individually and in his official
capacity as a secretary at Skyline
High School,

      Defendants.

_____ /

Case No. 22-12632

Hon. F. Kay Behm
United States District Judge

Hon. Curtis Ivy, Jr.
U.S. Magistrate Judge

**OPINION AND ORDER ON PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (ECF No. 65) AND DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF No. 64)**

## I.   INTRODUCTION

This case is about a public high school's alleged infringement of its

students' First Amendment rights when it proposed edits to a morning

announcement, submitted by the school's Republican Club, because the

announcement as submitted expressed the Republican Club's opposition

to a ballot proposal that would constitutionalize a right to abortion in

Michigan in the 2022 midterm election.  The school argues that it did not allow any student group to use its morning announcements and PA system to advocate for a specific position on a ballot measure (but did, for example, permit all clubs – including the Republican Club – to use the daily announcements to advertise their upcoming events, meetings, or social media accounts where the groups could espouse whatever views they had on those measures, or express flavors of political viewpoint not tied to a specific candidate or ballot measure).  The school also edited a proposed morning announcement from the National Organization of Women (NOW) to remove language that advocated for the opposite position on the same ballot measure.

For the reasons detailed below, the court finds that Plaintiffs fail to prove a constitutional violation or violation of federal law because Plaintiffs have not presented evidence on which a reasonable jury could find that either Nielsen or the Republican Club were treated any differently than any other club at Skyline High School, nor that the proposed edits to their morning announcement or the procedure the school used to edit announcements for all student groups otherwise

2

violated the Constitution or federal law.  Defendants are therefore entitled to summary judgment on all counts.

## II.   PROCEDURAL HISTORY

This matter is before the court on the parties' cross motions for summary judgment.

Plaintiffs Soren Nielsen[1] ("Nielsen") and the Skyline Republican Club (sometimes referred to for brevity as "SRC" or "Republican Club") brought this suit in the Eastern District of Michigan on November 1, 2022, challenging Skyline High School's ("Skyline") denial of a proposed morning announcement.  The proposed announcement advocated for other Skyline students to join the Republican Club's efforts to defeat Proposal 3 at the ballot in the 2022 midterm election, which was held Tuesday, November 8, 2022.  This case was assigned to the Honorable Paul D. Borman.  The Defendants are Ann Arbor Public Schools ("AAPS"), as well as two employees of AAPS, and more specifically Skyline High School: Cory McElmeel (then-principal of Skyline)

---

[1] Plaintiff was originally captioned "David Nielsen, parent and next friend, on behalf of his minor child, S.N."  The parties and caption were amended to reflect that Soren Nielsen (S.N.) is no longer a minor child and can proceed on his own behalf; David Nielsen is no longer a party to this case.  ECF No. 39.

("McElmeel"), and Jefferson Bilsborrow ("Bilsborrow") (McElmeel/the Skyline Principal's Secretary).[2]

On November 2, 2022 (the day after the case was filed), Plaintiffs filed an *ex parte* motion for a temporary restraining order requiring the school to air their proposed morning announcement as written. A hearing was held two days later, on November 4, 2022, at which counsel for both parties appeared. That same day, the court issued an order granting the temporary restraining order in part, ordering Skyline to air a modified version of the announcement. *See* ECF No. 14. On Monday, November 7, 2022 (the day before the November 8 election), the school aired the modified announcement during the morning announcements.

After this initial flurry of activity, the election at issue occurred on Tuesday, November 8, 2022, and this case then proceeded on an ordinary schedule. A scheduling order was issued in early January 2023. Shortly after the parties began to engage in discovery, the case

---

[2] As he described the role: "According to the District or the HR job posting, it would be secretary to the principal. At the school, I'm called assistant to the principal. Not assistant principal. It's like on The Office." ECF No. 64-2, PageID.709; *see* THE OFFICE: *The Alliance* (NBC television broadcast, aired Apr. 12, 2005) (Michael: "Assistant *to* the regional manager, Dwight.").

was reassigned to the undersigned (*see* docket entry between ECF Nos. 22 and 23), and this court entered a new scheduling order (ECF No. 23). Discovery occurred over about two years, and the parties subsequently filed their summary judgment motions in January 2025.

Both motions are fully briefed.  *See* ECF No. 64 (Defendants' motion); ECF No. 69[3] (Plaintiffs' Response); ECF No. 74 (Defendants' Reply); ECF No. 65 (Plaintiffs' Motion); ECF No. 68 (Defendants' Response); ECF No. 75 (Plaintiffs' Reply).  Oral argument was held on the motion on April 10, 2025, at which counsel for both parties were present.

For the reasons set out more fully below, Defendants' motion for summary judgment is **GRANTED** as to all counts and Plaintiffs' motion is **DENIED** in full, closing the case.

## III.  FACTUAL BACKGROUND

---

[3] In the future, if Plaintiffs' counsel require more pages for their brief, they should request that of the court in a separate motion, setting forth the reasons for additional pages rather than using lengthy single-spaced footnotes, which are not intended to be an end-run around the ordinary page limit.  *See* LR 7.1(d)(3); Practice Guidelines: Motion Practice (B); *e.g.* ECF No. 69, PageID.1995 n.43.

Skyline is one of five public high schools within the Ann Arbor Public School District.  ECF No. 64-6, PageID.968 (JS 78).[4]  Skyline airs daily morning announcements over its Public Address ("PA") system during second period classes.  ECF No. 64-2, PageID.720 (JB 88).  Six minutes are therefore added to that period to account for the lost instructional time.  ECF No. 64-9, PageID.982 (Skyline Bell Schedule).  A student generally reads all announcements for the day; sometimes Bilsborrow does it.  ECF No. 65-4, PageID.1346 (JB 43); *id.* at PageID.849 (CM 156) ("Typically, we have student representatives read announcements.").  They are read right at the beginning of second period, around 9:16-9:18am.  ECF No. 64-2, PageID.720 (JB 88); ECF No. 64-9, PageID.982 (bell schedule).  After they are aired, Skyline's "Daily Announcements" are published on the District's website, and are emailed to Skyline parents and students.[5]  ECF No. 64-5, PageID.916

---

[4] From this point on, the court adopts the parties' citation style as to deposition testimony: the initials of the deponent followed by the page number (e.g. ECF No. 12, PageID.3456 (AB 123)).  The deponents in this case were Paul DeAngelis as the representative of AAPS (AAPS), Cory McElmeel (CM) (then-principal of Skyline High School), Jefferson Bilsborrow (JB) (assistant to the principal), Jeanice Swift (JS) (then-superintendent of AAPS), and Soren Nielsen (SN) (Plaintiff, former president of the Skyline Republican Club).

[5] The prior link to archived announcements, https://www.a2schools.org/domain/2249, now results in a 404 error.  It appears that

(SN 118-19); ECF No. 64-4, PageID.854 (CM 176); ECF No. 64-23, PageID.1033 (community members could subscribe to be emailed the daily announcements).

Each AAPS high school maintains non-curriculum student clubs (such as Chess Club, Robotics Club, etc). To be "approved" as a student club recognized by the school, a club must have a staff sponsor and submit a form for approval. ECF No. 64-2, PageID.715, 718-19 (JB 66-68, 81-82); ECF No. 64-5, PageID.895 (SN 37). Skyline only airs announcements for approved student clubs.[6] ECF No. 64-2, PageID.742. It reminded clubs of this requirement over the morning announcements between Friday, October 14, 2022 and Monday, October 17, 2022. ECF No. 64-11, PageID.986.

Note that this method of airing announcements was somewhat unique to Skyline among the Ann Arbor public school system. Each

the new site, https://skyline.a2schools.org/skyline-family-resources/daily-announcements, does not include announcements back to 2021-2022. The court relies solely on the records of prior announcements provided by the parties that are part of the exhibits to their briefings.

[6] Bilsborrow apparently made a one-time exception for Math Club in October 2022, telling them that they were "NOT on the Skyline Club list" but that he would "run your announcement for math club this morning." ECF No. 69-2, PageID.2001 (Email from Bilsborrow to Math Club representative). Plaintiffs otherwise agree that policy generally applied. ECF No. 69, PageID.1974.

high school has different forms of announcements.  ECF No. 64-3, PageID.768-69 (AAPS 73-74).  Pioneer High School had a similar system, but Huron High School has written announcements. Community High School has a "forum bulletin" where they post submissions after review.  The alternative high school does not do student announcements at all.  *Id.*

## A.    Plaintiffs proposed a morning announcement opposing Proposal 3

On October 21, 2022, Plaintiffs submitted an announcement advocating against "Proposal 3" in the then-upcoming November 8, 2022 midterm elections.  Proposal 3, known as "Reproductive Freedom for All," was a citizen-initiated proposed state constitutional amendment.  The language that appeared on ballots to describe the amendment was that it would "establish [a] new individual right to reproductive freedom, including [a] right to make all decisions about pregnancy and abortion; allow state to regulate abortion in some cases; and forbid prosecution of individuals exercising established right."[7]

---

[7] Ballot Proposal 3 of 2022, House Fiscal Agency, https://www.house.mi.gov/hfa/PDF/Alpha/Ballot_Proposal_3_of_2022.pdf, https://perma.cc/UY2W-YLRE.

The announcement that Plaintiffs submitted to Bilsborrow to be read on the morning announcements said:

> Attention Students
>
> Are you interested in joining our efforts to protect the health of women and children by joining us in our fight to defeat Proposal 3?
>
> If proposal 3 is passed it would eliminate health and safety regulations, legalize late term and partial birth abortion, no longer require physicians to perform abortions, and eliminate informed consent laws.  If so, email us at skylinerepublicanclub@gmail.com.

ECF No. 64-12, PageID.990.

That same morning, Nielsen emailed a Skyline employee, Laurie Adams, at around 8:00 am claiming that a new sponsor had been found and had emailed Adams to get the Skyline Republican Club approved to submit announcements.  ECF No. 65-7, PageID.1824.  A little after 9:00 am, Adams confirmed that the Republican Club was "back on the list." *Id.*

Bilsborrow did not approve the announcement, and it was not read.  At 9:11am, Plaintiffs received an email from Adams informing them their submission would be rejected due to its "political nature." ECF No. 65-7, PageID.1824.  The email stated "We are not allowed to

advertise political activities per AAPS School Board Policy as stated below" and then cited AAPS's policy stating "any political parties, organizations, and/or candidates" are "expressly prohibited" "from promoting political activities and/or individuals on school property during school hours." *Id*.; *see also* ECF No. 1, PageID.22.

Defendants allege that Bilsborrow did not air the announcement because (1) initially, the Republican Club was still in the process of obtaining approval and (2) because the announcement was promoting a political position on a current ballot initiative. ECF No. 64, PageID.673; ECF No. 64, PageID.686. Plaintiffs, for their part, say that "Skyline Republican Club was an approved club as of the morning of October 21, 2022. ECF No. 69, PageID.1974. Plaintiffs also dispute the second reason for denying the announcement because, in their view, that reason was not the same reason initially given by Bilsborrow.

On that same day (a Friday), after announcements aired, Nielsen and his sister went to Bilsborrow's office demanding to know why the Republican Club's announcement was not read. ECF No. 64-2, PageID.710 (JB 48). Nielsen secretly recorded the conversation. ECF No. 64-2, PageID.733 (JB 140-141); ECF No. 64-5, PageID.930 (SN 177);

*see* ECF No. 65-10 (media file upload of audio recording); ECF No. 65-9, PageID.1837-44 (transcript of audio).  Bilsborrow told Nielsen that Skyline could not air the announcement as it was "essentially a political ad."  ECF No. 65-9, PageID.1838.  Bilsborrow further told Nielsen that the announcement was subjective as it was attempting to tell people how to vote, advocated for a political position on a ballot measure, and set forth a political opinion on that measure.  ECF No. 64-2, PageID.710, 716, 729, 733-34 (JB 49, 72, 125, 140-42).[8]  Bilsborrow offered to work with Nielsen to modify the announcement to ensure it aired, but Nielsen refused.  ECF No. 64-12, PageID.990-91 (Bilsborrow Affidavit); ECF No. 65-9, PageID.1840 (transcript of conversation: "If you say [in the announcement,] we're meeting and [] we'd like to -- like you to join after school at 3:00, that's acceptable.").

Although Nielsen did not talk to Bilsborrow about editing the announcement so it could air within the school's restrictions, he instead retained counsel.  Counsel reached out to the superintendent of AAPS, Dr. Jeanice Swift, on October 26 (the following Wednesday) to allege

---

[8] Bilsborrow's recollection: "I told him it was a subjective political campaign ad and that didn't fit the description of what I had been given for what sort of announcements were appropriate for the morning announcements over the PA system."  ECF No. 64-2, PageID.710 (JB 49).

that Skyline "expressly prohibited Mr. Nielsen's message . . . but warmly welcomed, announced, and promoted the pro-abortion viewpoints of Planned Parenthood and NOW." ECF No. 64-28, PageID.1047; ECF No. 65-3, PageID.1251.

On October 28 (Friday), McElmeel emailed Nielsen and reiterated that the District may not use its resources to advocate for or against any ballot initiatives. McElemeel also referred to Bilsborrow's proposed modifications and noted again that he and his team "will happily work with you to create an announcement that is not in violation of campaign finance law, as we have done with other student groups, at your earliest opportunity." ECF No. 64-20, PageID.1026. Nielsen did not respond. On Tuesday, November 1, McElmeel followed up again via email, suggesting Nielsen stop by the office and asking Nielsen if he could be of support to ensure the Republican Club had an announcement that could be shared. ECF No. 64-21, PageID.1029.

## B. Plaintiffs file lawsuit and TRO entered; Skyline airs the announcement as modified in the order

On that same day (November 1), Plaintiffs filed this suit; on November 2, they filed an *ex parte* motion for a temporary restraining

order requiring the school to air their announcement as written.  A

hearing was held on November 4.  ECF No. 15 (transcript of hearing).

That same day, Judge Borman issued an order granting the temporary

restraining order in part, ordering Skyline to air a modified version of

the announcement.  *See* ECF No. 14.

As a result of Judge Borman's order, the Republican Club

announcement that was eventually read on November 7, 2022,[9] was:

> Attention Students
>
> Are you interested in joining our efforts to protect
> the health of women and children?[10]
>
> If proposal 3 is passed it would eliminate health
> and safety regulations, legalize late term and
> partial birth abortion, no longer require
> physicians to perform abortions, and eliminate
> informed consent laws.
>
> If so, email us at
> skylinerepublicanclub@gmail.com.

ECF No. 64-13, PageID.1000 (announcement record for Nov. 7, 2022).

---

[9] The 4th (the hearing date) was a Friday; the 7th was the following Monday.

[10] This version deleted only the phrase "by joining us in our fight to defeat
Proposal 3?"  The remaining text is the same as what Plaintiffs submitted.  *See* ECF
No. 14, PageID.198 (TRO Order).

**C.    Another student group proposed an announcement about Proposal 3 with an opposing viewpoint, which the school edited**

While all this was going on, in the same run-up to the November 8 midterm election, on October 24, 2022, the National Organization of Women ("NOW") student club requested to run the following announcement:

> Hi Skyline!  Considering that Roe v. Wade was recently overturned, the elections coming up on November 8th are very important.  We encourage everyone capable to vote, to vote.  You can still register online at Michigan.gov.  For more information, including who the NOW club is supporting in the upcoming elections, you can visit our Instagram @skylinenowclub!

Without first asking NOW, Bilsborrow modified that announcement by removing the sentence with the reference to *Roe v Wade* and adding a new first sentence:

> ~~Hi~~ **Get registered to vote,** Skyline! ~~Considering that Roe v. Wade was recently overturned, t~~**T**he elections coming up on November 8th are very important.  We encourage everyone capable to vote, to vote.  You can still register online at Michigan.gov.  For more information, including who the NOW club is supporting in the upcoming elections, you can visit our Instagram @skylinenowclub!

ECF No. 64-12, PageID.991 (Bilsborrow's edits emphasized in strikethrough, underline, and bold); ECF No. 64-2, PageID.722 (JB 94-95) (Bilsborrow edited the submission without notifying the club). That announcement aired as modified on October 25, 26, and 27. ECF No. 64-2, PageID.721 (JB 91). He removed the reference to Roe v. Wade because he viewed that sentence as making a subjective statement regarding how to vote on Proposal 3 (regarding Michiganders' access to abortion), knowing that Proposal 3 was on the ballot. *See* ECF No. 64-2, PageID.721 (JB 91-93).[11]

If someone navigated to NOW's Instagram page (as their announcement suggested), they could click on a link to get access to NOW's voting guide in the 2022 elections (which, to be clear, supported Democrats). ECF No. 65-6, PageID.1652 (JS 90-92); ECF No. 65-5, PageID.1577 (NOW Voting Guide).

---

[11] Note the timing: NOW submitted their proposed announcement on October 24, three days after SRC's announcement had been denied because it advocated for a particular position on Proposal 3. But this submission on the 24th happened before defense counsel reached out to the school on October 26; in other words, the denial of NOW's announcement preceded any knowledge by the school that Nielsen had acquired counsel.

**D.    Other announcements generally included information about student events, occasionally expressing some political viewpoint (unconnected to a specific election)**

The record includes many examples of morning announcements, which help give a flavor as to the kinds of ordinary communication happening within the forum.

> i.    *"School-submitted" announcements*

Some announcements appear to speak for the school itself.  For example:

(on or about October 13, 2022)

> Club Advisors were asked to verify the clubs they are in charge of.  If your advisor did not reply, your club was removed from the list of approved clubs and organizations.  In order to get your club reactivated, if it is still active, you will need to fill out the new club form again, have your advisor initial next to their name, and bring it down to the athletic office for RE-approval.  Please add a note to the form that this is a reactivation.  Until your club is added back to the list on the website, you may not meet or request announcements. Thank you.  (ECF No. 65-5, PageID.1606).

September 9, 2022:

> Homecoming, or HoCo, as you kids call it, is only
> 3 weeks away!  Next Wednesday, we will begin
> releasing specific information about Homecoming
> Week.  If you want to bring a non-Skyline student
> to the Homecoming Dance, Guest Forms are
> available in both SLC-Offices, in, the Main Office,
> and outside Room A115.  Dance Forms are DUE
> Monday, September 26th, by 3pm.  Don't Wait!
> (ECF No. 65-5, PageID.1592).

May 26, 2022:

> After June 1st all district issued technology must
> be returned to the District Balas Warehouse!
> Graduating seniors return technology devices to
> Balas Warehouse: June 2nd, June 7th, and June
> 9th from 4-6pm.  (ECF No. 65-5, PageID.1598).

*See also* ECF No. 65-5, PageID.1614 (SAT and AP test information);

ECF No. 65-5, PageID.1617 (reminder to students to reset their Google

passwords).

Occasionally, the school would also make announcements outside

of normal announcement time for ad-hoc needs.  *E.g.*, ECF No. 64-2,

PageID.709 (JB 44) ("Bus 28 is running late").

ii.   *Teacher-submitted announcements*

One announcement gets a fair amount of attention in this case.

Planned Parenthood has a program where they train students as "peer

educators," who are then available for students to go to if they have

questions about health topics that they're uncomfortable going to an adult for.  ECF No. 64-4, PageID.843 (CM 130).  A content lead in the district communications department sent an announcement about this program to Skyline's health class teacher, which she forwarded to McElmeel and Bilsborrow to put on the announcements in the fall and advise students of the opportunity.  *Id.*; *see also* ECF No. 64-2, PageID.727 (JB 114) (the announcement was sent by the district content lead to all high schools in the district).  The goal is "to recruit . . . two students per building that we can identify that would be ambassadors to health[.]"  ECF No. 64-4, PageID.843 (CM 131).  To become a Peer Educator, students would complete outside training with Planned Parenthood of Michigan via a program that was available to high school students in Washtenaw County and Kent County.  ECF No. 68, PageID.1877.[12]  Accordingly, the school aired the following announcement pursuant to the district content lead and health teacher's request:

> Peer Education

---

[12] *See* Peer Education, Planned Parenthood of Michigan, *available at* https://www.plannedparenthood.org/plannedparenthood-michigan/local-education-training/programs-workshops/peer-education, https://perma.cc/JKJ3-XVSV.

> Are you interested in possibly becoming involved with Planned Parenthood of Washtenaw County's Peer Education program?  The program needs area youth that want to make a difference in their community and are interested in public health, advocacy and leadership.  Planned Parenthood of Michigan Peer Educators are trained, trusted sources of information and support for their peers about their health: including topics like relationships, LGBTQ+ identities, contraceptive methods, abstinence, consent, and reducing STIs and more!  The group meets weekly and presents in local high school health classrooms.  Peer Educators will go through a 40-hour training in the fall.  All applicants must be attending high school in 9th, 10th, or 11th grade during the 2021-22 academic year.  Applications will be due September 20.  Please email Mrs Bezeau if you would like the electronic application forwarded to you.

ECF No. 65-5, PageID.1581 (September 14, 2021).

It aired over the couple of days before applications were due and appeared right after the other "school-submitted" announcements.  *See id.* (appearing after Homecoming information, and before any of the "club-specific announcements); ECF No. 65-5, PageID.1583 (September 15, 2021, appearing after announcements congratulating National Merit semifinalists, reminder for the Club Fair, and Homecoming information, but again before the club-specific announcements); ECF No. 65-5, PageID.1586 (September 17, 2021, again appearing after the

19

reminders about Homecoming events and before the club-specific

announcements).

A few more of these kinds of announcements, though not

specifically raised in the briefings, appear in the exhibits and bear

similar hallmarks of being announcements submitted by teachers.

For example:

> Volunteer Opportunity
>
> Are you interested in our Democracy and helping
> others to become involved with the voting
> registration process?  The League of Women's
> Voters of Washtenaw County comes to Skyline
> High School a few times a year to help students
> to register to vote.  Their organization would like
> to start training high school students to become
> building reps for their own high school building to
> educate and inform their peers on how to register
> to vote.  You can contact Mrs. Bezeau if
> interested and she can share the training date
> and a zoom link for the next training event for
> high school students in Washtenaw County.  We
> would love to have 3 to 5 of our own peers helping
> and educating each other!  (ECF No. 65-5,
> PageID.1610-11).

As far as Bilsborrow recalled the program from his time working

at Community High School (in the AAPS system), the "League of

Women Voters came to Community High School when I was there, and

as far as I'm aware, they didn't discuss any ballot initiatives, they only

signed students up to vote." ECF No. 65-4, PageID.1373. The

announcement was submitted by the health teacher. ECF No. 65-5,

PageID.1486 (CM 197).

A few more:

> On Saturday. March 19th, University of Michigan
> is hosting an event called the Brain Bee at the
> Michigan League. . . . U of M is currently in the
> process of gathering student participants for
> Brain Bee. To find out more information about
> Brain Bee - please check your Grade Level
> Schoology page for dates and website info. This
> announcement is provided to us at Skyline,
> through a Skyline Alum who got involved with
> Neuroscience because of this program - so we
> thank him for the exposure to this. If you need
> more information, please see Mrs. Bezeau or
> Mrs Warner! (ECF No. 65-5, PageID.1611).

> Juniors, interested in studying the sciences or
> architecture in college? Want one hundred and
> twenty thousand dollars to get you started? The
> Rensselaer Medal might be just the ticket! We
> can nominate one top Skyline student by May
> first for this prestigious award. See Mr. B in the
> CUBE for more information. (ECF No. 65-5,
> PageID.1612).

> Jewish students are encouraged to join the Hillel
> college seminars tonight on-line to learn about
> what's up with antisemitism on campuses. Mr.
> B. has posted the link outside of the CUBE. (ECF
> No. 65-5, PageID.1612).

### iii.   Student-submitted announcements

The majority of announcements, which followed the "school-submitted" announcements, are identifiable as submissions by student groups.  Often, those announcements are merely a notification of an event, with little more than some information about what the identity of the club and the time of an upcoming meeting.  For example:

Songwriting Club (October 26, 2022):

> Attention all singers, rappers, writers, and music producers: Songwriting Club meets today after school in the choir room on the first floor.  (ECF No. 65-5, PageID.1595).

Skyline Quiz Bowl (September 9, 2022):

> Skyline Quiz Bowl invites you to join us for our first meeting after school next Monday, September 12th. in Room A402.  Quiz Bowl is a trivia game that tests a team's knowledge in a wide range of topics.  This year, we plan to compete in tournaments, head-to-head, against other schools.  (ECF No. 65-5, PageID.1591).

Skyline Theatre (September 16, 2021):

> Auditions for Skyline's Musical "All Together Now!" Tuesday, Sept. 21 from 4-6:30 in the Experimental Theatre [sic] Come sing a 16 bar selection of a song you choose and be a part of "All Together Now!" a show Skyline will perform

> concurrently with over 3,500 other theatre groups
> to celebrate the re-opening of live theatre.  To
> find out more talk to Mr. Brockie in the main
> office or Mrs. Roberts in the Experimental
> theatre or go to our website skylinehstheatre.org
> (ECF No. 65-5, PageID.1589).

More relevantly to Plaintiffs' claims, some student groups occasionally made announcements that can be seen to express some form of viewpoint beyond just an event announcement, however anodyne that view may sometimes be (though occasionally, the viewpoint is more obvious or controversial).  Consider:

Student Action Senate (March 3, 2022):

> This announcement speaks to all students who
> feel passionate about women's rights.  This
> Friday from 2:45-3:30 pm in room A40, the club
> students in government will be doing a
> presentation on the feminist movement and
> women's history in America to precede upcoming
> protests and projects in favor of women's rights.
> These events will be facilitated by students
> in government.  Please join us for cookies, soda,
> and feminism.  (ECF No. 64-3, PageID.777 (AAPS
> 106)).

Black Student Union (February 25, 2022):

> Happy Black History Month!
> Today's theme for Black History Month Spirit
> Week: Black and Red Solidarity Day. . . . The
> Black American experience has been one of
> absolute hardship and strife.  However, the

ability to rise above and deeply influence a
nation, to continually rebuild, love, fight, and
resist, is nothing less than perseverance- and so
much more.  By considering each other's lives,
experiences, and perspectives, we allow a
community to not only be about what we have in
common but what makes us different.  (ECF No.
65-5, PageID.1605).

Latinx Student Union (October 14, 2022):

¡Buenos dias estudiantes de Skyline high school!
Este es el last day of Hispanic heritage month.
This quote is from a Pitbull song que se llama
Times of our Lives, Dice: "This is for everybody
going through tough times, believe me, been
there, done that, but everyday above ground is a
good day, remember that."[13]

Also, I would like to kindly remind everyone that
the term Latinx is for a person of Latin American
origin or descent.  It is used as a gender-neutral
or non-binary alternative to Latino or Latina.
Please reach out to Latinx Student Union if you
would like to discuss this topic further, feel
offended by its usage, or have any new
suggestions.[14] (ECF No. 65-5, PageID.1606-07).

Gay, Straight, Romanticality Alliance (April 21, 2022):

---

[13] *See* PITBULL AND NE-YO, *Time of Our Lives*, *on* Globalization, at 3:57-4:04
(CD, RCA Rec. Nov. 17, 2014).

[14] As an example of how Plaintiffs characterize these announcements as
expressing different viewpoints than their own, Plaintiffs say this shows the Latinx
Student Union's "thoughts on cultural names and gendering."  ECF No. 65,
PageID.1071-72.

Tomorrow, April 22nd, is the National Day of Silence. The Day of Silence is a student-led demonstration. Across the US, LGBTQ+ students and their allies take a vow of silence to protest the harmful effects of discrimination, harassment, and erasure of LGBTQ+ people in schools. Members of Skyline's GSRA will be passing out info cards before class tomorrow morning, . . . . (ECF No. 65-5, PageID.1608).

NOW Club (May 26, 2022):

The NOW club will be holding a fundraiser for Ukraine through Friday. We will be selling bracelets at the front doors before school and in the cafeteria during both lunches. . . . (ECF No. 65-5, PageID.1598).

Skyline Democrats (February 21, 2017):

The Skyline High School Democrats of America are holding a poster-making session after school in Ms. Ducker's room today to spread awareness regarding the contributions Planned Parenthood makes to the health and well being of our society. Stop by to make a difference! (ECF No. 64-3, PageID.780 (AAPS 119)).

National Honor Society (October 14, 2022):

Debbie Dingell Visiting Skyline.

Are you interested in getting better leadership skills? Want to learn how to take action for something you believe in? Congresswoman Debbie Dingell is visiting Skyline next Wednesday, October 19th, in the auditorium from

3 p.m. to 4 p.m. to speak about these topics and
more. The NHS board welcomes everyone to
attend. (ECF No. 65-5, PageID.1487 (CM 199)).

NOW Club (December 13, 2021):

The National Organization for Women's Club
would like to invite you to stand in solidarity by
wearing pink in support of the 1973 Roe vs. Wade
court decision which allows women to keep
abortion rights. On Tuesday December 14th join
us and show your support. (ECF No. 64-2,
PageID.734 (JB 144)).

Skyline Republican Club (October 26, 2021):

Interested in defending our personal freedoms
and the freedoms of others? Interested in
learning more about our wonderful Constitution
and what makes America so special? The
Republican club is for you! We meet TODAY in
room C408 right after school! Come see what our
club is all about. If you have any questions please
feel free to email us at
Skylinerepublicanclub@gmail.com and follow us
on Instagram @skylinerepublicanclub. We can't
wait to see you there! (ECF No. 64-13,
PageID.1003)

Skyline Republican Club (November 11, 2021):

Interested in learning more about what
conservatives stand for? Interested in learning
more about our Constitution and how it makes
America so great? Interested in understanding
why we believe in what we believe such as limited
Government? Come to the Skyline Republican
Club in room C408 and follow us on Instagram

@skylinerepublicanclub. We can't wait to meet
you! (ECF No. 64-13, PageID.1001)

Skyline Republican Club (February 17, 2022):

In honor of Presidents day the Skyline
Republican club would like you to join us in
honoring our past and current presidents by
wearing RED White and BLUE this Friday.
(Note please do not wear an actual American flag
as it is a sign of disrespect.)  We can't wait to see
all of our fellow students showing off their
patriotism!  (*Id.*)

The record also includes many examples of the Republican Club

having morning announcements approved after this lawsuit was filed.

ECF No. 64-13, PageID.997-1000; *id.* at PageID.1007-1010.  These

examples are not included here because, in the court's view, they are

less relevant to the question of whether the forum was equally open *at*

*the time* of the alleged wrongdoing, though they are more relevant to

the issue of injunctive relief.

## E.    Other avenues of expression are available to students

Of course, it is worth keeping in mind that a high school's morning

announcements are far from the only method by which students may

communicate with their peers or the community at large while at school

or school-related events.  For example, students can speak their minds

at club meetings, at school board meetings, organize their club to canvas for their preferred political causes, use their social media accounts while at school, or engage in substantive discussions with other students. ECF No. 64-5, PageID.913 (SN 107-109) (Nielsen asked McElmeel to put American flags in every classroom and to have classes do the Pledge of Allegiance); *id.* at PageID.912 (SN 103) (Nielsen spoke at school board meetings about covid restrictions); *id.* (SN 102) (SRC club meetings); *id.* at PageID.937 (texted about leading anti-masking walkout and held meetings to discuss canvassing in the community). They might give a quote to the school newspaper or local newspaper. ECF No. 65-3, PageID.1272 (NOW Club); ECF No. 68-6, PageID.1950 (Republican Club). They can wear clothing to express their position on a particular subject. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); ECF No. 64-13, PageID.1001 (Republican Club hosted red, white, and blue spirit day). Clubs can create Instagram or other social media pages where their speech is not subject to pre-publication approval by the school. ECF No. 65-5, PageID.1623 (NOW Club); ECF No. 64-5, PageID.901, 937 (SN 58-59, 203) (Republican Club). Students might use their project in art class to make a point,

pick an essay subject where they argue for their preferred position, or join the debate team and extemporize from a makeshift podium to an audience of their peers.  More relevant to the claims in this case, student clubs may post flyers throughout the school regarding upcoming meetings, as long as they are approved and stamped by the school.  ECF No. 64-5, PageID.898 (SN 46); ECF No. 64-3, PageID.772 (AAPS 87-89) (bulletin boards in use by school and students could post approved material).  The Republican Club was never prevented from posting such flyers by the school, and had in fact posted flyers in the past.  ECF No. 65-7, PageID.1699 (SN 46).

Note: while SRC never sought approval to post a flyer ahead of the 2022 election, NOW club did.  ECF No. 65-5, PageID.1576.  Their flyer stated: "Need to learn about voting?  [O]r [w]ant to learn who/what the NOW club is supporting in the upcoming elections?  Scan this QR Code!"  *Id.*  If a student scanned the QR code on the flyer, it led to NOW's voting guide for the election.  *Id.*; ECF No. 65-3, PageID.1328; ECF No. 65-5, PageID.1577 (but note: this guide was available only if a student scanned the QR code, it was not on the flyer itself).

Students can also, though outside of the school's "approved" channels of speech, protest through collective action. Skyline Republican Club, for example, exercised their First Amendment rights in April, 2022, when they protested Skyline's mask mandate during covid. ECF No. 64-5, PageID.905 (SN 75-77). Nielsen organized that protest, distributed digital flyers about it to other students, and walked out of school. *Id.* McElmeel, as Skyline's principal, emailed staff to give them a head's up that they learned that students were planning a walkout. ECF No. 64-8, PageID.979.

Similarly, other students held a walkout in response (and opposition) to the aired Republican Club's announcement on Nov 7, 2022.[15] During the November 7th walkout, McElmeel stated to all participating students, "this is considered an unexcused absence. Please return to class." ECF No. 64-27, PageID.1045; ECF No. 64-4,

---

[15] It is slightly unclear who exactly organized that walkout. At times it is referred to in the record as the "NOW" walkout, but texts from school administrators and emails attribute organization of the event to GSRA. ECF No. 64-3, PageID.792 (AAPS 168) (reading a text from McElmeel: "The demonstration appears to be organized by members of the GSRA"); ECF No. 68-5, PageID.1943 (screenshots of that text); ECF No. 65-3, PageID.1286 (email from GSRA). It is not a critical point; the bottom line is that while some groups held pro-Proposal 3 walkouts in November 2022, Skyline Republican Club did not organize an anti-Proposal 3 walkout at that same time but had in the past been allowed to walk out on the same terms as any other student group.

PageID.848 (CM 152).  McElmeel later shared with the Skyline newspaper that "the day's demonstration was not a school approved/sanctioned event."  ECF No. 64-27, PageID.1045; ECF No. 64-4, PageID.873 (CM 250-52).  The school emailed staff to let them know that some students planned on exercising their right to protest.  ECF No. 65-3, PageID.1329.

The NOW student club also earlier organized[16] a walkout at Skyline in response (and opposition) to the leaked opinion of *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), on May 12, 2022. ECF No. 64-3, PageID.794 (AAPS 174-175); ECF No. 65-3, PageID.1269 (news story about the protests at Skyline and Pioneer high schools). The school similarly emailed staff to let them know that some students planned on exercising their right to protest.  ECF No. 65-3, PageID.1267; ECF No. 65-3, PageID.1287.

### F.    School Policies on Announcements, Walkouts, and Freedom of Expression

The school has several policies relevant to this case.

---

[16] ECF No. 65-5, PageID.1620 (NOW Instagram page advertising the walkout).

### i.      Campaign Finance Policy

AAPS generally has a policy that states, "The Superintendent shall notify any political parties, organizations, and/or candidates that they are expressly prohibited from promoting political activities and/or individuals on school property during school hours."  Board Policy 7250.R.01 – Use of Facilities, ECF No. 64-16, PageID.1015.  AAPS also argues that it is subject to the Michigan Campaign Finance Act (MCFA), and directs the court to an interpretive statement of that Act by the Michigan Attorney General.  *See* ECF No. 68-4, PageID.1930 (exhibit to their response brief).

The MCFA generally regulates the "use of public funds for political purposes,"  Mich. Comp. Laws § 169.201 *et seq*., and it prohibits a "public body" (including a school district) from using or authorizing the use of "funds, personnel, office space, computer hardware or software, property, stationery, postage, vehicles, equipment, supplies, or other public resources to make a contribution or expenditure . . . ."  *Id.* at § 169.257, 169.211 (defining "public body" to include public school

districts and school boards).[17]  The interpretive statement issued in 2005 indicates that "sending a mass e-mail or mailing that expressly advocates support for a ballot question or candidate or urges constituents to vote for or against a candidate or ballot question would result in the use of public resources to make an expenditure.  The use of public resources in this manner falls squarely within the [] prohibition against" political expenditures.  *See* Interpretive Statement of Oct. 31, 2005, ECF No. 68-4, PageID.1932.[18]

Consistent with its interpretation of that interpretative statement and statute, AAPS policy proscribed the use of its facilities or resources to advocate for "subjective political content supporting active ballot measures."  ECF No. 64-2, PageID.732 (JB 134); ECF No. 64-28, PageID.1048 (letter from AAPS counsel to Nielsen and defense counsel

---

[17] The compiler's note states: "It is the policy of this state that a public body shall maintain strict neutrality in each election and that a public body or a person acting on behalf of a public body shall not attempt to influence the outcome of an election held in the state.  If there is a perceived ambiguity in the interpretation of [this section], that section shall be construed to best effectuate the policy of strict neutrality by a public body in an election."

[18] The Secretary of State is authorized to make interpretive rulings under § 169.215.  The ruling in question is also available at: https://www.michigan.gov/sos/-/media/Project/Websites/sos/10delrio/Murley_2005.pdf, https://perma.cc/72L7-889M.

on October 31, 2022).[19]  The four deponents for AAPS all testified that

they were trained on this policy over their years working for AAPS.  *See*

ECF No. 64-2, PageID.732 (JB 134) (Bilsborrow deposition: "Q: Where

do you get that? A: From 11 years of experience working for the Ann

Arbor schools."); ECF No. 64-3, PageID.762 (AAPS 49) (testifying that

the policy applying the directive on campaign finance law to student

speech had been provided to administrators and staff in August of

2022); ECF No. 64-4, PageID.820 (CM 38) (Skyline and AAPS trains

staff that "we don't advocate for or against any ballot measures."); *id.* at

PageID.822 (CM 46) ("we receive training time and time again over the

past 20 years about being very careful about not advocating for or

against ballot initiatives . . ."); ECF No. 64-6, PageID.959 (JS 45-46) (

"We've always practiced [the campaign finance rule] during my time. . .

. The fundamental principle of not using district resources in advocacy

for a current candidate or ballot measure . . . is fundamental to our

work."). *see also* ECF No. 65-7, PageID.1824 (Adams, in notifying

---

[19] For brevity, the court sometimes refers to this ban on "advocating support for a ballot question or candidate" using district facilities or resources as the "campaign finance" rule or "campaign finance" policy.

Nielsen that his announcement was rejected, referencing District Policy 7250.R.01 § 5.5 on not directly advocating for electoral issues).

Thus there is no dispute that this policy was in place at the time. ECF No. 64-4, PageID.821(CM 42) ("Q: And that was in place before Oct 2022? A: Yes. . . . I've seen no changes in district policy around announcements.").  And there is no dispute that McElmeel and Bilsborrow understood that policy to apply to Skyline's announcements. ECF No. 64-4, PageID.821-22 (CM 45-46) ("[T]here's a good number of things we think about when it comes to announcements . . . [r]elevance, brevity[,] [i]nformational . . . frequency . . . groups are treated fairly and equally . . . is there a upcoming bill or ballot proposal that the person is advocating for or against, because that would violate a law, is there some interpretation of that ballot that is not direct language that would confuse or try to persuade someone differently and be given as the school's voice."); ECF No. 64-20, PageID.1026 (email from McElmeel citing the policy); ECF No. 64-2, PageID.732 (JB 134) ("the District's policy on free speech [] as it pertains to announcements . . . includes no subjective political content supporting active ballot measures."); ECF

No. 64-12, PageID.990 (Bilsborrow Affidavit). No evidence genuinely contravenes that testimony.

Plaintiffs say different: they argue the AAPS representative testified that the District's Board Policy 7250.R.01 (Use of Facilities) did not apply to student clubs or announcements. ECF No. 69, PageID.1977 (citing ECF No. 64-3, PageID.782 (AAPS 128), 783 (AAPS 132-33)). Perhaps – what he mostly testified was "*I'm not sure* that this statement here [the district policy] covers the content of political announcements read by student organizations during PA time." *Id.* at PageID.783 (AAPS 132) (emphasis added) (when pinned down, he made a stab at it: "I'm going to say it does not."). Notably, the superintendent said differently. ECF No. 64-6, PageID.958 (JS 41) (stating Bilsborrow's statements to Nielsen were consistent with district policy). But anyway, the district representative's equivocal testimony (and even in the light most favorable to Plaintiffs, his single statement) does not establish that McElmeel and Bilsborrow understood that to be the case, and the evidence also establishes there was no single district-wide policy on announcements; each school had its own system. So the relevant decisionmaker on the Skyline-*specific* announcements policy is

not the district at all – it is the school principal and the school secretary administering his directives, and there is no genuine dispute that both of those individuals – notably the specific Defendants in this action – applied or extended the District policy to the morning announcements at Skyline.

### ii.    Announcements

Next, the rest of Skyline's policy on announcements.  The record reflects that well before Nielsen or Skyline Republican Club asked to air the announcement at issue, Skyline High School had an established policy of how to handle announcement requests.  McElmeel trained Bilsborrow, because the 2022-2023 school year was Bilsborrow's first at Skyline,[20] to vet announcement requests and assigned him the responsibility to handle these requests on a daily basis.  ECF No. 64-4, PageID.854 (CM 175).  Bilsborrow is designated as the person who generally approves, denies, or edits announcements that will be read out (e.g., ECF No. 65-4, PageID.1355 (JB 81)), but occasionally input from another administrator occurs (ECF No. 64-3, PageID.803 (AAPS 212)).

---

[20] ECF No. 64-4, PageID.869-70 (CM 237-38).

The process of submitting an announcement is straightforward and remains the same as it was at the time: a student fills out a google form, which outputs to a Google Docs spreadsheet that Bilsborrow reviews.  ECF No. 64-2, PageID.708 (JB 41).  Bilsborrow then makes the decision of whether to approve a particular request or not.  ECF No. 64-2, PageID.708 (JB 41).  This was Bilsborrow's first year at Skyline (though he worked in the AAPS school system for 11 years, *id.* at PageID.706 (JB 30-31)), and McElmeel, who trained him, had been principal for about a decade.  *Id.* at PageID.710 (JB 49); ECF No. 64-4, PageID.812 (CM 6).  As Bilsborrow described the conversation: "it was a brief conversation, but he said - and it was a year ago, but he essentially said announcements need to be short, they need to be informative, they need to be relevant to activities happening at the school with students and staff, and we need to treat groups fairly and equally and I need to review them and decide what was appropriate and what wasn't for that venue, announcement over the whole school."  ECF No. 64-2, PageID.714 (JB 63).  McElmeel only added to that list: "There's also frequency, how often should an announcement occur or not." ECF No. 64-4, PageID.821 (CM 45).  "[O]ur initial training mainly

accounted for that as well as the other things that I spoke to you about that we covered in terms of campaign finance law, neutrality, and ensuring . . . that there's no material or disruption to the educational environment[.]"  ECF No. 64-4, PageID.831 (CM 82).  In other words: announcements had to be short, contain relevant information for school activities, be appropriate for school setting, not air too frequently, groups had to be treated equally, not run afoul of the district campaign finance rule, and announcements may be reviewed (i.e. edited or denied) on the basis of those criteria.  This policy was not written down; it was simply communicated to Bilsborrow by McElmeel.  *See* ECF No. 64-2, PageID.714 (JB 62).

This rule had resulted in a number of announcements being rejected over the years.  ECF No. 64-4, PageID.831 (CM 85) ("[I]n my ten years at Skyline, there have been announcements that have been not run that have been submitted.  Students at times have submitted silly announcements, requests for birthday shout-outs, requests for silly things, . . .").  Because this was Bilsborrow's first year with Skyline, he himself had not rejected many on the basis of content (he does seem to have rejected at least one, about a TED Talk that did not have to do

with Skyline).  ECF No. 64-2, PageID.741 (JB 173).  He had also rejected announcements on the basis that they were not from approved clubs.  *Id.*; ECF No. 64-4, PageID.831 (CM 85) ("non-approved groups have submitted announcements and those have not ran"). It does, however, appear to be the first time that an announcement was rejected for being a political ad.  *See* ECF No. 64-2, PageID.714 (JB 62).  There is no evidence that other rejections were connected specifically to the policy against political campaign ads over the announcements, rather than running up against different requirements.  *E.g.*, ECF No. 64-3, PageID.803 (AAPS 212-13) (announcements related to a murder and suicide in the community not approved).  However, it also appears from the record, and from questions at oral argument, that although Nielsen's announcement was the first time an announcement had run up against the policy against political campaign ads, that was simply because no other announcement had ever attempted to advocate for or against a ballot proposal (compared to the many vaguely political announcements that were aired because they did not specifically speak to a particular ballot issue).

     *iii.*   *Walkouts*

Some of the parties' dispute centers on the relevance of student protests (referred to as "walkouts" because the students walk out of school and gather outside the building). The school's policy on walkouts was emailed to school staff ahead of each known (or expected) student protest, when the administration became aware of them, and read as follows:

> In general, the following applies to student walkouts/protests:
>
> · We will respect the rights of all students, whether they choose to participate or not.
>
> · No student will be required to participate in any student-led walkout/protest
>
> · To the extent possible, the administration will work with our student leaders and coordinate supervision and procedures to assure student safety of our campuses.
>
> · We will ensure a structured environment on our campuses for an students, whether they choose to participate or not.

*E.g.* ECF No. 65-3, PageID.1267 (regarding NOW walkout, May 2022).

The policy emailed to staff is a "copy and paste," sent out to staff "every time there was a student demonstration": ECF No. 64-4, PageID.870 (CM 240); ECF No. 64-8, PageID.979 (SRC walkout in April

2022); ECF No. 65-3, PageID.1329 (GSRA walkout in November 2022); ECF No. 65-3, PageID.1287 (NOW walkout in May 2022) (all have the same four bullets).[21]

Neither the school nor school staff endorses or participates in these walkouts. When they occur, students are marked absent if they miss class,[22] and while some teachers or administrators do go outside to be near the walkout, they do so merely to monitor for safety issues (because the students generally just do a lap on school property).[23] ECF

_____

[21] The only obvious difference between the instructions given to staff is that the information regarding the two walkouts in April and May 2022 also included a warning to staff about noncompliance with mask mandates: "All students are expected to remain respectful and follow student guidelines for safety, including wearing masks while our guidelines still require such. Noncompliance with our mask requirement will be viewed as materially disruptive and substantively disorderly. Students wishing to 'Protest' this requirement will be directed to a safe location on the outside of our school buildings. Students refusing to comply with a staff directive to properly wear a mask will be subject to school discipline, including emergency removal." *E.g.*, ECF No. 65-3, PageID.1267. Notably, that warning appeared for *both* the anti-masking walkout by SRC in April *as well as* NOW's anti-*Dobbs* walkout in May, so SRC was not treated any differently as to that instruction. *See* ECF No. 64-8, PageID.979; ECF No. 65-3, PageID.1267.

[22] ECF No. 64-6, PageID.965 (JS 66) ("They are counted absent during the time that they are outside of class. And if you're saying do I know that every child was counted absent on November 7th, no, sir, I didn't take the roll, but I can speak to you about that is our practice."). If the walkout happens during passing time, and the student returns before attendance is taken, they are not necessarily marked absent. *See* ECF No. 64-4, PageID.847 (CM 147) (about 70 students marked unexcused or tardy); ECF No. 65-3, PageID.1295 (telling teachers that if students showed up to class, they can be marked present).

[23] ECF No. 65-5, PageID.1475 (CM 151) ("they do the one lap around the building").

No. 64-3, PageID.794 (AAPS 176) ("when students walk out, all we do as administrators is ensure there is safety and order on the campus"); *id.* at PageID.847 (CM 148) ("so at that time we're really monitoring students, ensuring their safety, the safety of the campus, that no one is entering the campus unauthorized and that all of those students within that group are safe. If there's competing demonstrations, then our goal is to find two spaces that they could do that peaceably and there our goal is to make it as short and quick as possible and asking students to return to class and remaining content neutral during that time."). When students asked administrators to do more than simply stand there (like borrow a bullhorn), they refused. ECF No. 64-4, PageID.848 (CM 151) ("At some point, a student leader [during the pro-Prop 3 walkout] comes over to me because their PA system battery dies and they ask me to use my bullhorn to continue their protest, and I deny them that access, letting them know that they can't use District resources to advocate for or against a ballot initiative. They continue verbally without any projection and then I lead them back to class, they do the one lap around the building before we return."). When parents reached out, concerned that another AAPS high school was encouraging

their children to join the walkouts rather than stay in class, the response was straightforward: "We do not sanction walkouts or protests, but we also cannot prohibit them." *E.g.*, ECF No. 65-3, PageID.1303 (email regarding protest at Pioneer high school).

       *iv.*   *General policy on Freedom of Expression and Change to Announcement Policy*

Lastly, the district has a general policy regarding freedom of expression, which applies to Skyline as well as any other school:

> Student speech is protected by the First Amendment of the United States Constitution. Students have the right to express themselves openly on school premises about matters of social, political, and religious importance. However, students may not express themselves in a way that causes a disruption of, or interference with, the orderly conduct of learning or school activities, or that is inconsistent with the school district's basic educational mission. **Teachers and administrators may edit the style and content of student speech** at school assemblies, **in school newspapers**, school theatrical productions, **and at other school-sponsored activities**, where teachers and administrators have legitimate educational concerns about such disruption or interference.

ECF No. 64-7, PageID.977 (District Policy on Student Freedom of Expression) (emphasis added).

Since this suit was commenced, Skyline alleges that it has made some changes to that policy as it applies to announcements. Presently, the school's announcement policy appears on the google form used to submit proposed morning announcements and incorporates the prior policy with the policy on freedom of expression, as well as a few new requirements (though the parties disagree whether these changes have substantively altered the policy). It reads:

> Requests for Skyline announcements may be submitted via the Announcement Request Form linked below by club/organization staff sponsors. The purpose of Skyline announcements is to provide students with pertinent information regarding school and district-approved activities, programs, and/or updates. Announcements are expected to be concise and informative of current Skyline High School activities and programs. All announcements are subject to review, revision, and approval by school personnel. Determination for announcement inclusion will be made based on priority, relevance, and availability. **Announcements must be submitted at least 48 hours in advance for review and approval.**
>
> Students and/or community members desiring to have an announcement made must work with a club/organization staff sponsor to submit the request. A request will only be considered if it contains information regarding school and/or district-approved activities, programs, or updates regarding school and district functions.

DISTRICT PHILOSOPHY ON STUDENT
FREEDOM OF EXPRESSION

Student speech is protected by the First
Amendment of the United States Constitution.
Students have the right to express themselves
openly on school premises about matters of social,
*political,* and *religious* importance.  However,
students may not express themselves in a way
that causes a disruption of, or interference with,
the orderly conduct of learning or school
activities, or that is inconsistent with the school
district's basic educational mission.  *Teachers and
administrators may edit the style and content of
student speech at school assemblies, in school
newspapers, school theatrical productions, and at
other school-sponsored activities, where teachers
and administrators have legitimate educational
concerns about such disruption or interference.*

ECF No. 64-24, PageID.1035 (2023 - 2024 Skyline Morning

Announcement Request Form) (emphasis in original).

## IV.   STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be

granted "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or

is genuinely disputed must support the assertion by: (A) citing to

particular parts of materials in the record . . . ; or (B) showing that the

46

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or

other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

## V.    ANALYSIS

Plaintiffs bring four counts against Defendants in their complaint: unconstitutional viewpoint discrimination under the First Amendment (Count I), unconstitutional prior restraint under the First Amendment (Count II), equal protection violation (Count III), and violation of the Equal Access Act (20 U.S.C. § 4071) (Count IV), and seek nominal damages, declaratory and injunctive relief, and attorneys' fees. The court first addresses the threshold issues of whether Plaintiffs' claims for declaratory or injunctive relief have been rendered moot by intervening events and whether Judge Borman's earlier ruling on the

temporary restraining order in any way binds the court at summary

judgment (Section IV.A), and then proceeds to address the merits of the

alleged constitutional violations (Section IV.B).

## A.    Threshold Issues: Standing, Mootness, and Law of the Case

Soren Nielsen brought this case as a high school senior on his own

behalf, and on behalf of the student club he was president of, to enjoin

portions of school policy as to the morning announcements.  Since then,

he has graduated from high school, it was somewhat unclear whether

current members of the club agreed to allow this litigation to continue

on their behalf, and the policy to approve morning announcements was

revised by the school.  As a threshold matter, the court must consider

whether these events bar some of the claims in this case.

### i.    *Standing for injunctive relief*

A student's challenge to a school policy is moot once the student

has graduated.  *Ahmed v. Univ. of Toledo*, 822 F.2d 26, 27 (6th Cir.

1987).  Because he is no longer a student at Skyline, Nielsen lacks

standing to seek any of the injunctive or declaratory relief originally

brought.  His claims for nominal damages, however, which "are the

appropriate means of vindicating rights whose deprivation has not caused actual, provable injury," are not moot. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986).

First, the court considers whether Plaintiffs' claims for declaratory and injunctive relief may be reviewed on the merits, and whether counsel can bring this case on behalf of Skyline Republican Club at all now that Nielsen has graduated.  And second, if Skyline Republican Club is a proper party to this litigation, it must still have representative or direct organizational standing to seek injunctive relief on behalf of its members.

Defendants contested Plaintiffs' standing for injunctive relief, which seemed to raise the question of whether counsel could proceed to litigate on behalf of a student organization, when the only members who allege that the Club approves of the litigation in its name appeared to have graduated.  *See* ECF No. 68, PageID.1874, 1887; *e.g. Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake Cty., Fla.*, 842 F.3d 1324, 1331 (11th Cir. 2016) (remanding for district court to consider whether a school club had standing when its members appeared to have graduated); *remanded to* 249 F. Supp. 3d 1286, 1289 n.5 (M.D. Fla.

2017) (on remand, finding that because a minor had confirmed they were a current member of the GSA, the GSA had organizational standing to pursue prospective relief for the school year 2016-2017).  In their reply, Plaintiffs provided a declaration from the subsequent club president after Nielsen graduated, who said that the club voted to continue as a plaintiff in this lawsuit during the 2023-2024 school year. ECF No. 75-1, PageID.2185.  The year is 2025, and that declaration still did not establish whether any members of the club at the time of that vote are still students at Skyline High School.  However, at oral argument it was noted that a representative for a current student ("M.H.") appeared at a settlement conference in this case on July 16, 2024.  In reviewing the record of that conference, the faculty advisor for the Skyline Republican Club, Janet Sherman, appeared at the settlement conference in her capacity as advisor to the club and on behalf of a current student; in the court's view, Sherman's participation is sufficient at this stage to demonstrate that SRC continues to approve of this litigation in its name.[24]

---

[24] Sherman, for example, has submitted announcements to Bilsborrow on behalf of Skyline Republican Club.  ECF No. 64-29, PageID.1052.

The court thus proceeds to the standing analysis. There are two forms of organizational standing—representative standing and direct standing. *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 36 (D.D.C. 2021). "To establish direct standing to sue in its own right, an organizational plaintiff . . . must demonstrate that the 'purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action.'" *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021) (citations omitted). There has been no allegation that the Skyline Republican Club has expended any resources to challenging this suit, so the court turns to representative standing.[25] Even where an organizational plaintiff lacks standing to sue in its own right, it may sue on behalf of its members if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and

---

[25] The Sixth Circuit has noted, and questioned, whether this analysis could even include "voluntarily using resources to counter the government action." *See Tenn. Conference of the NAACP v. Lee*, 139 F.4th 557, 2025 U.S. App. LEXIS 13814 at *16-17 (6th Cir. 2025) (questioning the effect of *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) on the direct standing analysis). But where there's no allegation that SRC has in fact voluntarily expended any resources, that point is not necessary to address. *See* ECF No. 65-6, PageID.1682 ("We do not charge for our services.").

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The second and third elements are met: the Republican Club has an interest in communicating its messages to the Skyline student body, and neither the injunctive relief sought nor constitutional claims asserted require a student's individual participation (the club itself can submit announcements). As to the first question – whether an individual member would have standing in their own right – that is effectively the same one debated by the parties: whether a current member of the Republican Club can expect an announcement to be denied or edited in a similar way to the one Nielsen submitted, and therefore could show the requisite "ongoing harm or imminent future harm" to obtain declaratory or injunctive relief. *See Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (citing *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001)). That question boils down to the same issue raised by Defendants in their motion for summary judgment – whether Plaintiffs' claims for

injunctive relief were mooted by the intervening change in district

policy as to morning announcements, and the court turns to that issue.

      *ii.    Mootness*

Defendants allege that the policy to approve announcements has

changed since the start of the litigation.  Specifically, the former policy

was a combination of written policy, training, custom, and practice:

submission by google form, which Bilsborrow could edit as needed

before airing according to the existing policies surrounding

announcements.  *See supra* Section III.F.i-ii.

This practice was done in light of the general district policy

prohibiting the use of district resources to advocate for ballot issues,

and a more general policy on student freedom of expression in any form:

> Teachers and administrators may edit the style
> and content of student speech at school
> assemblies, in school newspapers, school
> theatrical productions, and at other school-
> sponsored activities, where teachers and
> administrators have legitimate educational
> concerns about such disruption or interference.

ECF No. 64-7, PageID.977 (AAPS Rights & Responsibilities

Handbook 2021-22).

The new policy, specific to announcements, is quoted in its entirety above.  *Supra* Section III.F.iv.  Defendants argue that this change in their policy constitutes voluntary cessation of the challenged conduct that moots any claim for injunctive or declaratory relief.  ECF No. 64, PageID.681.

Voluntary cessation of the alleged illegal conduct does not, as a general rule, moot a case and "deprive the tribunal of power to hear and determine the case."  *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)).  Voluntary cessation will only moot a case where there is "no reasonable expectation that the alleged violation will recur," and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Davis*, 440 U.S. at 631 (cleaned up).  "The burden of demonstrating mootness is a heavy one."  *Id.*  True, "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties," because the government's "self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) (quoting

*Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012), *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990)).  But "[d]etermining whether the ceased action 'could not reasonably be expected to recur,' takes into account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed."  *Schlissel*, 939 F.3d at 768 (quoting *Friends of the Earth*, 528 U.S. at 189).  In that analysis, less solicitude is given to regulatory actions that are "ad hoc, discretionary, and easily reversible[.]"  *Id.*  The same is true when the change happened after a complaint is filed and the government continues to assert the constitutionality of its prior regime.  *Id.* at 769-70.

Here, Defendants assert that they have rescinded the challenged policy in a formal way (when the new announcement request form was created) and the policy was repealed for a reason unrelated to the suit (because the policy changed nearly one year after this lawsuit was filed only to ensure club sponsors were aware of and approving all announcements).  ECF No. 64, PageID.681.  The court disagrees with that framing.  The change appears to be merely one announced by the school's administration; its "formality" is limited to the fact that it was

announced as a new policy.  The timing is no better; the change may have been a year after this case began, but it is a fair assumption that this lawsuit and accompanying press coverage may have contributed to that change.  Further, the school continues to assert the constitutionality of their original process – so the damages claim, at least, is not moot regardless of whether the injunctive relief is moot.

Most importantly, however, it is not at all clear from the terms of this policy how outcomes would differ from the old policy.  By the court's reading, the primary changes to the policy are 1) that student club sponsors (teachers, not students) will submit the proposed announcements, though presumably on behalf of students who may in practice draft the announcements in the first place, 2) it is now explicitly communicated to students that announcements are meant to "inform about school-approved activities or programs" (though they always had to be short and informative) and 3) the policy explicitly emphasizes that announcements may be edited by school personnel (though again, they always could be).  The general district policy on freedom of expression, now appearing in the announcements policy itself, appears to be identical to the district policy that already existed.

This change in policy is not sufficient to show Plaintiffs' claims are moot. To test the point: if the Skyline Republican Club sponsor submitted the exact same proposed announcement in regard to some future Proposal 3 (whatever the content of that Proposal), there is nothing in this new policy that indicates that announcement, too, would not be edited or denied by the school on the basis of promoting a political viewpoint about a particular ballot item in an upcoming election. Setting aside whether the act of denying the originally submitted announcement was constitutional, the school has not shown "enough evidence to satisfy its burden to show that its voluntary cessation makes it 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Schlissel*, 939 F.3d at 770 (quoting *Friends of the Earth*, 528 U.S. at 189). Therefore, the Skyline Republican Club's claim challenging the process by which Skyline High School reviews student-submitted morning announcements is not moot, and the SRC has standing to bring claims for injunctive relief.

    *iii.*   *Law of the Case*

One final preliminary issue: Plaintiffs urge this court to adopt the "law of the case" doctrine in regard to Judge Borman's ruling on the

temporary restraining order, and hold that the findings made in the order granting the TRO bind this court at summary judgment.  ECF No. 69, PageID.1986 (citing *Daunt v. Bensin*, 999 F.3d 299 (6th Cir. 2021)). If that were the case, this motion would be superfluous; this case would have been effectively decided at that hearing.  But it is well-settled that rulings on temporary restraining orders and preliminary injunctions generally do not constitute law of the case.  *Guillermety v. Sec'y of Educ.*, 241 F. Supp. 2d 727, 731 (E.D. Mich. 2002) (citing *Wilcox v. United States*, 888 F.2d 1111, 1113-1114 (6th Cir. 1989) ("A party [] is not required to prove his case in full at a preliminary-injunction hearing . . ., and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").[26]  This is because, "[g]iven [the injunction's] limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis

---

[26] Plaintiffs' citation to injunction *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021), is inapposite.  That court said although "the law-of-the-case doctrine applies to higher and lower courts alike, it is primarily 'intended to enforce a district court's adherence to an appellate court's judgment.'"  *Id.*  And it continued, "the law-of-the-case doctrine may be inapplicable when the legal conclusions in a preliminary-injunction decision were based on an underdeveloped record, issued under time pressures related to the circumstances of the preliminary injunction at issue, . . ."  *Id.*

of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Wilcox*, 888 F.2d at 1113; *see Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984) ("A factual finding made in connection with a preliminary injunction is not binding" on a motion for summary judgment.). If that rule is true as to preliminary injunctions, it is even more true as to the greater haste involved in a hearing for a temporary restraining order. Here, a review of the docket and the transcript of the hearing for the temporary restraining order, held only two days after the motion and three days after the complaint was filed, makes plain the haste that was necessitated by the then-looming election deadline, as well as the lack of the fully developed record and evidence that is now before the court. Two years of discovery, complete deposition transcripts, and a full record of evidence that includes announcements submitted by all clubs, including the Skyline Republican Club, and walkouts led by Skyline Republican Club as well as other groups, lend a more complete picture than was available on the record at the time, as the court will address in greater detail below. The court's preliminary ruling and

findings on the temporary restraining order do not bind this court on a final ruling on the merits.

## B.  Constitutional and Federal Claims Under Section 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must establish the deprivation of a right secured by the Constitution or laws of the United States caused by a person acting under color of state law.  *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).  However, the doctrine of qualified immunity protects government officials, including school officials, from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Morse v. Frederick*, 551 U.S. 393, 401 (2007).

Because the court finds no constitutional violation, it does not ultimately analyze the merits of whether the rights at issue were clearly established.  *See Pearson v. Callahan*, 555 U.S. 223, 227 (2009) (the qualified immunity prongs can be addressed in either order).  But notably, Plaintiffs appear to abandon any argument on the clearly established prong as to their damages claims.  *See* ECF No. 69,

PageID.1994 (arguing only that qualified immunity does not immune

injunctive relief nor a *Monell* claim, but not addressing clearly

established law); ECF No. 69, PageID.1960 (conclusory statement that

"Defendants violated Plaintiffs' clearly established constitutional right

to freedom of speech and equal protection").  So even if there were a

constitutional violation here, the court would find that Plaintiffs'

nominal damages claims against Bilsborrow and McElmeel would not

overcome their failure to respond to those defendants' arguments, and

those two defendants must be dismissed in any event.  *See* ECF No. 64,

PageID.689-90 (arguing no clearly established law puts Plaintiffs'

claims beyond debate); ECF No. 69, PageID.1993 n.41 (response, not

addressing clearly established law other than to say "Plaintiffs' First

and Fourteenth Amendment rights as [sic] clearly established."); *Brown*

*v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A]

plaintiff is deemed to have abandoned a claim when a plaintiff fails to

address it in response to a motion for summary judgment.") (citing

*Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir.

2011) (holding that a district court properly declines to consider the

merits of a claim when a plaintiff fails to address it in a response to a

motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x

522, 524-25 (6th Cir. 2006) (recognizing that the failure to

respond properly to motion for summary judgment arguments

constitutes abandonment of a claim).

### i. Viewpoint Discrimination (Count I)

Students in public schools do not "shed their constitutional rights

to freedom of speech or expression at the schoolhouse gate." *Tinker v.*

*Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503, 506 (1969).

However, the First Amendment rights of students in the public schools

"are not automatically coextensive with the rights of adults in other

settings," and must be "applied in light of the special characteristics of

the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S.

260, 266 (1988) (quoting *Bethel School District No. 403* v. *Fraser*, 478

U.S. 675, 682 (1986), *Tinker*, 393 U.S. at 506). The questions in this

case, as the court sees them, are a) whether the morning

announcements are student speech or school-sponsored speech, and

because the court finds they are school-sponsored speech, b) whether

the school enforced its rule against "political campaign ads" in a

viewpoint neutral manner and c) whether the rule was reasonably

related to the purposes of the forum and the school's legitimate pedagogical concerns in running that forum.

        a)      Whether Morning Announcements are "Student Speech" or "School-Sponsored Speech"

There are three primary categories of speech that occur within the school setting. *Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 2d 780, 793 (E.D. Mich. 2003). Student speech that "happens to occur on the school premises," is governed by *Tinker*. *Hazelwood*, 484 U.S. at 271. Pure student speech, such as the black armbands worn by the students protesting the Vietnam War in *Tinker* or the t-shirts worn by the students in *Castorina v. Madison County Sch. Bd.,* 246 F.3d 536 (6th Cir. 2001), and *Barber v. Dearborn Pub. Sch.*, 286 F. Supp. 2d 847 (E.D. Mich. 2003), must be tolerated by the school "unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.'" *Hazelwood*, 484 U.S. at 266 (quoting *Tinker*, 393 U.S. at 509).

At the other end of the spectrum is "government speech," such as a principal speaking at a school assembly. When the government itself

is the speaker, it "it is entitled to say what it wishes," *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and to "select the views it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 460 (2009); *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000) ("When a public high school is the speaker, its control of its own speech is not subject to the constraints of constitutional safeguards and forum analysis, but instead is measured by practical considerations applicable to any individual's choice of how to convey oneself: among other things, content, timing, and purpose.").

Between pure student speech and government speech is "school-sponsored" speech, which is governed by *Hazelwood Sch. Dist. v. Kuhlmeier*. School-sponsored speech is student speech that a school affirmatively promotes, as opposed to speech that it "tolerates." *Hazelwood*, 484 U.S. at 270-71. "Expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" constitute "school-sponsored" speech over which the school may exercise editorial control so long as its actions in doing so "are reasonably related to legitimate pedagogical concerns." *Id.* at 271, 273. A key question in this case is whether students,

parents, and members of the public might reasonably perceive Skyline's morning announcements to bear the imprimatur of the school.

On one hand, announcements submitted by student clubs are plainly not government speech, because "high school students are capable of understanding the difference between private speech shared through public announcements of club activities and official speech on behalf of the school administration." *See Krestan v. Deer Valley Unified Sch. Dist. No. 97*, 561 F. Supp. 2d 1078, 1094 (D. Ariz. 2008). In contrast, Skyline itself airs some announcements on its own behalf, which are government speech. For example, when the school announced the policies for how clubs could have their announcements read, or had an announcement about the Homecoming dance, those announcements were from the school itself and would be reasonably understood as such. For the majority of announcements, however, the school permitted submissions by student clubs, each with their own slightly different tone and flair. *E.g.*, ECF No. 65-5, PageID.1593 ("Skyline Robotics is looking for new members! Whether you have experience with CAD programming or you just think robots are cool, we have a place for you on our team."); *id.* ("Are you interested in the

environment & sustainability?  Want to work with an international team from the comfort of your own home?  Thriving corals is a youth-run organization focusing on ocean sustainability through education.”); *id.* at PageID.1594 (“¡Hola chicos! Latino Student Union will begin next Thursday, the 15th of September . . .”); *see also* ECF No. 64-12, PageID.992 (“Interested in learning more about our government from a Constitutional and Conservative perspective?  Interested in being a more active, educated and concerned member of the community?  The Republican Club is for you!”).  Plaintiffs argue that this system the school had set up is controlled by the *Tinker* standard and that the announcements are “pure student speech.”  ECF No. 65, PageID.1083. In the light most favorable to Plaintiffs, that is not an unreasonable argument; “[t]he proposition that schools do not endorse everything they fail to censor is not complicated[,]” and “secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis.”  *See Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990) (though in the context of an Establishment Clause challenge).

But the view of Skyline's morning announcements as pure student speech doesn't quite work.  Students are aware, or at the very least ought to be, that the announcements were vetted by an administrator before being read out.  While not entirely the school's speech – and on a continuum are probably somewhat closer to student speech than government speech – student clubs do not have the unlimited ability to publish whatever statements they like, and Skyline students (not to mention other community members) were aware that some degree of pre-publication review occurs before an announcement is aired, thereby bearing some, not-meaningless "imprimatur" of the school's approval. Announcements occur over the school's public address system, are posted publicly on the school's website, and are emailed to community members, indicating that the school in some way "adopts" that speech as partially its own.  Compare, for example, students making a statement through an article of clothing.  *See Tinker*, 393 U.S. 503; *C.S. v. McCrumb*, 135 F.4th 1056, 1059 (6th Cir. 2025) (wearing hat on school's "hat day" with image of AR-15 and the words "Come And Take It"); *Castorina v. Madison Cty. Sch. Bd.*, 246 F.3d 536, 539 (6th Cir. 2001) (wearing Confederate flag t-shirts allegedly to celebrate Hank

Williams and Southern heritage).  No reasonable observer would attribute that speech to the school (nor did, in any of those cases, the school offer to carry that message on behalf of the student).  Or consider a club's after-school meeting, where a student who makes a few announcements to kick off the meeting plainly speaks only for themselves or the club.  *See E. High Gay/Straight All. v. Bd. of Educ.*, 81 F. Supp. 2d 1166, 1194 (D. Utah 1999) ("Allowing a student group to meet on school premises . . . does not equate with publishing a school newspaper.").

In contrast, all of a given morning's announcements are read out by a single student and are broadcast to all Skyline students and the community.  While everyone understands that particular announcements are made at the request of student clubs, members of the public also understand that the school has in some way approved or exercised editorial control over the message being communicated in a way the school does not vet or pre-approve other student speech that

might occur, for example, in the classroom, commons, cafeteria, or gym.[27]

The degree of editorial control exercised here is similar to that when a student speaks at a school assembly, as in *Poling v. Murphy*, 872 F.2d 757, 761 (6th Cir. 1989), *cert. denied*, 493 U.S. 1021 (1990). In *Poling*, the Sixth Circuit found that a "campaign" speech made by a public high school student who was running for student council president at a school assembly constituted school-sponsored speech. In that case, school officials scheduled the assembly to be held during school hours and on school property, made attendance compulsory for everyone, determined the eligibility of prospective speakers, and vetted the candidates' speeches in advance. The speech "did not just 'happen to occur' in the school, but rather occurred at [a] school-sponsored forum[]." *See Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 2d 780, 794

---

[27] Plaintiffs emphasize that the AAPS representative testified that students would likely think that the announcement was a message from Republican Club, and therefore they conclude that Defendants have admitted that it is student speech. ECF No. 64-3, PageID.807. But lay witnesses cannot testify to legal conclusions. Moreover, the court agrees that students would likely view the message as (at least in large part) "from Republican Club." But so too would a speech by Nielsen on behalf of SRC at an assembly be understood to be, in large part, "from Republican Club," but Plaintiffs would not have free rein to speak there either, as the discussion following explains.

(E.D. Mich. 2003). *Hazelwood*, for its part, found that a high school newspaper constituted school-sponsored speech. *Hazelwood*, 484 U.S. at 262. The morning announcements at Skyline are sufficiently similar to speech at a school assembly or a school newspaper to render them school-sponsored speech under the First Amendment: they are made during school hours, "attendance" is compulsory in the sense that they occur during second period, and the school determines the eligibility of speakers (an announcement must be submitted by an "approved" student club). Most importantly, at least some amount of review occurs by a school official before airing the proposed announcement, "and this fact was known by students and parents." *See Curry v. Hensiner*, 513 F.3d 570, 577 n.1 (6th Cir. 2008) (products sold in "Classroom City" activity had to be approved by the school and were school-sponsored speech). Therefore, the *Hazelwood* standard applies in analyzing Plaintiffs' freedom of speech claim in this case.

One analytical note: all agree that some sort of forum was opened when the school allowed student submissions to the morning announcements. But *Hazelwood* does not entirely clarify how the "school-sponsored speech" analysis overlaps with First Amendment

forum analysis, and the parties disagree how to characterize the forum created in this case.  Plaintiffs at times urge this court to consider the morning announcements a "limited public forum," (ECF No. 65, PageID.1083) (though they cite Equal Access Act cases for that proposition, which is a slightly different standard than in First Amendment jurisprudence, *see infra* Section V.B.iv), while Defendants characterize the announcements as a "nonpublic forum" (ECF No. 64, PageID.685).  The two might or might not offer different analytical frameworks.[28]  However, the finding that the speech at issue is school-sponsored speech resolves the point; as other courts have pointed out, *Hazelwood* is just a school-specific application of nonpublic forum analysis.  *See W. Mich. Band Instruments, LLC v. Grandville Pub. Sch.*, No. 1:17-cv-704, 2017 U.S. Dist. LEXIS 214126, at *5-6 (W.D. Mich. Aug. 31, 2017).

In *Hazelwood*, for example, although the Court never used the words "nonpublic forum," it found that the school newspaper was not a public forum, and then proceeded to analyze the school's restrictions

---

[28] *See Miller v. City of Cincinnati*, 622 F.3d 524, 535-36 (6th Cir. 2010) (concluding that "government limitations on speech in both a limited public forum and a nonpublic forum receive the same level of scrutiny.  In both instances, any restrictions must be 'reasonable and viewpoint neutral.'") (citation omitted).

under the nonpublic forum framework.  *See W. Mich. Band Instruments*,
2017 U.S. Dist. LEXIS 214126 at *5-6 (citing *Hazelwood*, 484 U.S. at
269-270) (explaining how *Hazelwood* applied the nonpublic forum
standard set forth in *Perry Education Association v. Perry Local
Educators' Association*).  Under *Perry*, the government may restrict
speech in nonpublic forums if the constraints are reasonable in light of
the purpose of the forum and do not amount to viewpoint
discrimination.  460 U.S. 37, 46 (1983).  In *Hazelwood*, the court
phrased the inquiry slightly differently: whether the restrictions "are
reasonably related to legitimate pedagogical concerns."  *Hazelwood*, 484
U.S. at 272.  Courts considering school-sponsored speech in what are
effectively also nonpublic forums have synthesized these two
approaches to say that "[i]n school settings, [] the analysis is slightly
more refined" and the nonpublic forum test is specifically whether the
restrictions are "reasonably related to legitimate pedagogical concerns."
*See Bannon v. Sch. Dist.*, 387 F.3d 1208, 1213 (11th Cir. 2004) (applying
nonpublic forum analysis and *Hazelwood*, 484 U.S. at 270); *Planned
Parenthood*, 941 F.2d 817, 825 (9th Cir. 1991) (indicating
*Hazelwood* slightly "constrain[s]" the ordinary nonpublic forum analysis

"by requiring that courts focus on unique attributes of the school environment and recognize broadly articulated purposes for which high school facilities may properly be reserved").

Thus, having found that the Skyline student-submitted morning announcements are school sponsored speech in a nonpublic forum, the court proceeds to apply the nonpublic forum test as it applies in high school settings: 1) did the school act neutrally with regard to viewpoint, and 2) was the restriction reasonable in light of the pedagogical (school-related) purposes of the forum? *See Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 2d 780, 797, 800 (E.D. Mich. 2003).

> b)   Both the policy and application of the policy were viewpoint neutral

The first question, then, is whether the school operated the morning announcements in a viewpoint neutral manner. The prohibition on viewpoint discrimination "operates as a check on the government's ability to prefer one point of view over others on the same topic." *Bailey v. Callaghan*, 715 F.3d 956, 964 (6th Cir. 2013). It serves to snuff out official actions calculated to drive "certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members*

*of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).  "A

commonsense understanding of the prohibition against viewpoint

discrimination is that government should be prevented from

intervening into an ongoing political controversy by silencing one side to

the dispute."  Robert C. Post, *Viewpoint Discrimination and*

*Commercial Speech*, 41 LOY. L.A. L. REV. 169, 170 (2007) (emphasis

added).  Put yet another way, "[t]he government must abstain from

regulating speech when the specific motivating ideology or the opinion

or perspective of the speaker is the rationale for the restriction."

*Rosenberger*, 515 U.S. at 828 (emphasis added).  But in nonpublic

forums, the government may impose content-based restrictions on

speech so long as they are reasonable in light of the purposes of the

forum.  *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018).

Defendants have consistently defended their decision to edit

Plaintiffs' announcement with one, straightforward reason: the

Republican Club's announcement was a political campaign ad about

Proposal 3, barred by the school's existing content-based rule against

using district resources to advocate for a current ballot issue.  As the

announcements are school-sponsored speech, they can reject

announcements that might appear to show the school putting its "imprimatur" on that advocacy.

Plaintiffs could thus survive summary judgment by showing that this purportedly viewpoint-neutral reason for denying the announcement was merely pretext for viewpoint discrimination in one of three ways: one, that policy itself was entirely pretextual, i.e. made up by school officials to specifically avoid airing this particular announcement, two, school officials in fact applied the purportedly viewpoint neutral policy in a discriminatory manner by treating different groups differently, or three, the policy existed but was only cited as a post-hoc rationale for a viewpoint-discriminatory decision. Plaintiffs cannot prove any of these options; nothing in the record supports Plaintiffs' assertion that their viewpoint or opinion was silenced, punished, or restricted in a way different from any other group. Even viewing the evidence in the light most favorable to Plaintiffs, their claims of viewpoint discrimination ultimately rest on "speculation unsupported, if not affirmatively contradicted, by the evidence in this case," which is insufficient to defeat summary judgment. *See Bucklew v. Precythe*, 587 U.S. 119, 144 (2019).

1.    There is no genuine dispute that the policy
was preexisting and Skyline administrators
understood it to apply to announcements.

First, the undisputed evidence shows that the policy against using
district resources to advocate for or against current candidates or ballot
measures existed long before Nielsen ever submitted his announcement,
which means that no reasonable jury could conclude the policy was
made up on the spot to deal with these particular Plaintiffs.  One way
that First Amendment plaintiffs generally can show viewpoint
discrimination in a forum is by showing that a purportedly neutral
policy was invented to deal "neutrally" with their particular disfavored
message.  *See Miller v. Allendale Charter Twp.*, No. 1:21-CV-1024, ---
F.Supp.3d ---, 2023 WL 12117432, at *9 (W.D. Mich. June 26, 2023)
(finding a dispute of material fact whether township, offering
personalized bricks surrounding war memorial, only started enforcing
content-based restrictions upon receipt of messages they didn't approve
of).  Thus, an otherwise viewpoint-neutral policy might nonetheless be
scrutinized based on the timing of when that policy arose.  *See Miller*,
2023 WL 12117432, at *9 ("In the past, the Township had exercised no

control over the messages engraved on the bricks in the Garden of

Honor.  Upon reviewing Plaintiffs applications, it tried to exercise

control, absent a written policy or clear directive allowing it to do so.").

Here, although there was concededly a longstanding written policy that

staff could edit announcements, Plaintiffs might have shown a genuine

dispute of fact had there been no evidence of the specific campaign

finance policy that AAPS staff cited to deny Plaintiffs' announcement,

or evidence suggesting that policy had never been in effect before.

But here, there is no genuine dispute that the campaign finance

policy existed.  ECF No. 64-6, PageID.959 (JS 45-46); Board Policy

7250.R.01 – Use of Facilities, ECF No. 64-16, PageID.1015; Interpretive

Statement of Oct. 31, 2005, ECF No. 68-4, PageID.1932.  There is no

genuine dispute that staff were trained on that policy over a period of

many years preceding this event.  *Id.*; ECF No. 64-4, PageID.820 (CM

38); ECF No. 64-2, PageID.732 (JB 134); ECF No. 64-3, PageID.762

(AAPS 49).  And there is no genuine dispute that the relevant

decisionmakers understood it to apply to all district resources, which

included things like announcements or lending bullhorns to students,

even if it was not specifically written down that the general policy

applied to announcements or giving a loudspeaker to a student.  *See*

*supra* Section III.A, III.F.i-ii; ECF No. 64-2, PageID.710, 716, 729, 733-

34 (JB 49, 72, 125, 140-42); ECF No. 65-7, PageID.1824 (Laurie Adams

email citing the policy); ECF No. 64-4, PageID.848 (CM 151).  To the

extent that was not written down anywhere, school administrators were

not required to write down these principles.  *See Hazelwood*, 484 U.S. at

273 n.6 ("We reject [the] suggestion that school officials be permitted to

exercise prepublication control over school-sponsored publications only

pursuant to specific written regulations.  To require such regulations in

the context of [the school newspaper] could unduly constrain the ability

of educators to educate.").  Even in the light most favorable to Plaintiffs,

there is no genuine dispute that the policy against allowing district

resources to advocate for or against ballot issues was understood by

McElmeel and Bilsborrow to be a blanket prohibition that included a

wide variety of school resources, including announcements.

2.    Plaintiffs have not shown differential

treatment under the policy.

The court turns to the question of whether the policy was applied

differently as to the Republican Club.  But on that point, too, Plaintiffs'

case founders.  Skyline's written policies explicitly reserve the right to control content in school-sponsored speech.  ECF No. 64-7, PageID.977; *see Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist.*, 941 F.2d 817, 823-24 (9th Cir. 1991).  And for two groups, seeking to express opposite opinions on the same ballot issue, that is exactly what the school did.  NOW proposed an announcement encouraging students to check their Instagram page to find out more about who NOW was supporting, and the school, via Bilsborrow, removed the line "considering that Roe v. Wade was recently overturned" as a subjective political opinion barred by the rule against using district resources to advocate for or against a ballot measure (i.e. telling people how to vote).  When Nielsen submitted the Republican Club's announcement and the entire announcement attempted to advocate for one side of a current ballot issue using school-sponsored speech, the school offered to work with him to edit it so that it complied with their policy, and he refused.[29]

---

[29] NOW's treatment is important here.  If NOW had not received the same treatment, and had been permitted to air their proposed announcement as written, or if NOW had proposed no announcement at all and there were no comparator, the court would find it a harder question whether an issue of fact existed as to the school's motivation (i.e. that at least some observers could reasonably question the

No reasonable jury could find that the refusal to air Nielsen's announcement, when the school also enforced the same, existing rule against another group on the opposite side of the same issue, constituted differential treatment or viewpoint discrimination.

3.    There's no genuine dispute that Bilsborrow reasonably applied the policy rather than using the policy as a post-hoc rationale.

That only leaves whether the school's many citations to their campaign finance policy are in fact just a cover for viewpoint discrimination, because, in Plaintiffs' view, Bilsborrow was not actually acting pursuant to the policy.  Plaintiffs argue that "Michigan's Campaign Finance Law . . . is a blatant pretense offered seven days after Defendants stated for themselves on multiple occasions that the announcement was rejected because of its political viewpoint."  ECF No. 65, PageID.1075.  The court disagrees with that assessment; the school freely admits that it rejected the announcement based on its political message not because it took one side or the other, but because the

_____

viewpoint-neutral explanation for not airing the announcement).  But where Plaintiffs cannot reasonably contest that NOW's opposing viewpoint received materially similar treatment regarding the same exact ballot proposal, their claims must fail as a matter of law.

political message itself ran up against the content-based (not viewpoint-based) rule against advocacy on current ballot measures.

The best evidence of why the school acted the way it did are Bilsborrow's statements right after the announcement was denied, obtained by Nielsen's surreptitious recording. The very first thing Bilsborrow told Nielsen – the same day he denied the announcement, and the first time he was confronted about it – was that he denied the proposed announcement "[b]ecause it was essentially a political ad and we don't run those announcements." ECF No. 65-9, PageID.1838. "[I]f you had put an announcement that said, our group is meeting on this day, or there's a fundraiser," that would have been a different story. *Id.* When pressed, he continued, "the announcement was basically saying, join us in our -- this is our position on this upcoming proposal." ECF No. 65-9, PageID.1842-43. The problem was, in his words: "you're telling people how to vote." *Id.* at PageID.1839. That is, in substance, the district policy. Announcements needed to be relevant to school activities (most often a meeting or fundraiser or activity run by the club itself), but by custom and practice announcements could also ask students to take action on "political" topics, as long as those topics were

not tied to a specific candidate or ballot issue (like wearing pink for the
anniversary of *Roe v. Wade* (NOW), asking students to use the gender-
neutral term "Latinx" rather than Latino or Latina (Latinx Student
Union), or wearing red, white, and blue (Republican Club)).  But district
resources (in this instance, school-sponsored speech over the PA system)
could not be used to advocate directly "for a current candidate or ballot
measure."  ECF No. 64-6, PageID.959 (JS 45-46).

To the extent that Bilsborrow's word choice might not precisely
track the language used by counsel in this case, that is not unexpected –
Bilsborrow is not a lawyer.  And despite that being the case, his
phrasing is perhaps the most succinct way that anyone in this case has
been able to put the district policy: say what you want to say about the
world, and as long as you include information about what your club is
doing we will likely let it air, but you cannot use our PA system just to
"tell people how to vote."  *See* ECF No. 64-6, PageID.958-59 (JS 40-43)
(superintendent stating that Bilsborrow's actions were consistent with

school policy even if he didn't phrase it the same way she would: "I believe his statement is consistent with district policy.").[30]

Continuing this theme, Plaintiffs argue that Laurie Adams' email to Nielsen shows the reasons given by the school were pretextual, because the campaign finance reasoning allegedly "conflicts with the reason given" initially in "Laurie Adams' email" as the basis to reject the student club announcement.  ECF No. 65, PageID.1076.  But that is a confusing argument, because the text of Adams' email directly cites the district policy against allowing district resources to be used to advocate for political activities.  ECF No. 65-7, PageID.1824.  While Laurie Adams is not alleged to be a decisionmaker and would likely only be a witness as to what her understanding of others' decisions was, her email is the temporally first evidence of why the school acted the way it did.  ECF No. 65-4, PageID.1424 (email sent at 9:11 am, about five minutes before the announcements aired).  It is therefore strong

---

[30] "We've always practiced [the campaign finance rule] during my time."  ECF No. 64-6, PageID.959 (JS 45).  "Now, whether I or a school secretary, in this case, would use the term 'Campaign Finance Act' might not happen every time we refer to it, but the practice of not using school district resources" to advocate for a current candidate or ballot measure "is fundamental to our work."  *Id.* at PageID.960 (JS 46).

evidence that the school in fact contemporaneously relied on their policy prohibiting advocacy for or against ballot measures or candidates.

Thus at face value, nothing about Bilsborrow's contemporaneous explanation or Adams' contemporaneous email indicates that he relied on the policy as mere pretext for viewpoint discrimination. However, although Plaintiffs do not directly address these points in depth in their briefings, in the light most favorable to Plaintiffs, there are still two issues raised by the evidence that warrant addressing: 1) whether it matters that this was the first time a student submission had been rejected under this rule, and 2) whether it matters that NOW's announcement was merely edited while SRC's was denied outright. In context of all of the facts available, the court finds that those are, alone, insufficient to create a dispute of material fact when 1) there is no evidence showing that any other group had submitted a non-conforming announcement that was allowed to air in the past, and 2) Bilsborrow's explanation for why he denied SRC's announcement compared to editing NOW's announcement and airing the modified announcement is consistent with the policy. The result is that any inference of viewpoint discrimination does not rise above the level of conclusory speculation.

Start with this being the first time the campaign finance rule had barred an announcement.  The parties have both represented that this was the first time that an announcement had been rejected under the campaign finance policy.  *See* ECF No. 64-2, PageID.714 (JB 62).  So, the obvious question is whether this first-ever application of that rule was pretextual.  To show that it could have been pretextual and avoid summary judgment, Plaintiffs needed to come forward with at least some evidence from which a jury could reasonably infer that, even though this was a longstanding policy and Bilsborrow cited it as his reasoning, the fact that this was the first time it was used to deny an announcement raises a genuine question of pretext.  *See Anderson*, 477 U.S. at 248, 251.  They have not presented any such evidence.  The same policy was, within days (and before Nielsen obtained counsel), used to edit a policy on the opposite side of the same debate, and there is no evidence that a single announcement similar to SRC's was submitted and permitted to air in the past.  *See United Food & Commer. Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 751 (6th Cir. 2004) (decision to exclude appellants from soliciting signatures in parking lots leading to polling places was viewpoint neutral as there

was no evidence other groups had been permitted to solicit signatures

for referendum petitions on other topics).  In other words, the mere fact

that it was the first time is not, on its own, enough to forestall summary

judgment, because there are no facts supporting discriminatory intent

and the inference of that intent remains, after two years of discovery,

unsubstantiated speculation.

So the only remaining path for Plaintiffs is whether it matters

that Bilsborrow denied SRC's announcement outright, but only edited

NOW's announcement.  It does not.  It was always the case that

announcements could be edited or denied; district policy did not require

one or the other.  ECF No. 64-7, PageID.977 (District Policy on Student

Freedom of Expression); *supra* Section III.F.i (campaign finance policy

was longstanding).  And as explained, Bilsborrow's explanation of why

he denied the announcement was consistent with the stated content-

based campaign finance policy and the rules regarding the format of

announcements, both at the time and at his deposition: "I disapproved

because it was subjective, he was trying to tell people how to vote, and

he didn't mention his club, an activity, or anything that was relevant to

the students and staff at Skyline, per se.  Most announcements that I've

done, almost all announcements all year long are about an event or an activity or reminding students to buy a yearbook while they're still on sale, and this announcement, it didn't have any  information like that for students that was relevant to day-to-day activities in Skyline."  ECF No. 64-2, PageID.716 (JB 70-71).  Put another way: "I had a problem that he wasn't including anything about when the club was going to meet, what time they were meeting.  All the announcements that I've got pretty much all year kind of fit that format, there's an event coming up, we want students to be aware of it, that sort of thing, and this one was advocating against Proposal 3 and there was nothing that was relevant to the staff and students . . ."  ECF No. 64-2, PageID.718 (JB 79).

His testimony also explains why NOW's announcement was only edited to excise one sentence, while the SRC announcement was denied entirely.  *See* ECF No. 64-2, PageID.729 (JB 124) (quoting from ECF No. 64-17, PageID.1018) ("The reason [Nielsen's] announcement was omitted entirely, instead of being modified, was because his announcement request included no neutral content - the entirety of his announcement request was a politically subjective stance on Proposal 3.

. . . Whereas, the announcement request by the National Organization of Women Club contained largely neutral information, allowing me to remove the politically subjective content, and still be left with a politically neutral announcement.").[31]  And not to belabor the point, but:

> [T]he decision would have been the same regardless of the amount of subjective content.  If 90 percent of their announcement request was subjective political content, I would have removed 90 percent, if 5 percent was subjective political content, I would have only removed 5 percent, but my actions would have been the same regardless of the amount of subjective content.
>
> *Q: But we went over Soren's submission. At the end of the day, you couldn't show where there was any subjective content in it.*
>
> A: No, that's wrong.  His entire thing was subjective.

ECF No. 64-2, PageID.729 (JB 125).

---

[31] Bilsborrow generally did not ask a club to change their submissions, he just edited the submissions directly.  ECF No. 64-2, PageID.722 (JB 94).  But that does not alter his conclusion here. Bilsborrow believed in order for the announcement to be aired, it had to be edited.  Stripped of the content he found to violate school policy, there was no appropriate content remaining other than "email us at skylinerepublicanclub@gmail.com," which he could reasonably infer was not necessary to air.

Bilsborrow's explanation matches his actions; a plain reading of the two submissions shows the differences between them:

| SRC submission | NOW submission |
|---|---|
| Attention Students.  Are you interested in joining our efforts to protect the health of women and children by joining us in our fight to defeat Proposal 3?  If proposal 3 is passed it would eliminate health and safety regulations, legalize late term and partial birth abortion, no longer require physicians to perform abortions, and eliminate informed consent laws.  If so, email us at skylinerepublicanclub@gmail.com. | Hi Skyline!  Considering that Roe v. Wade was recently overturned, the elections coming up on November 8th are very important. We encourage everyone capable to vote, to vote.  You can still register online at Michigan.gov. For more information, including who the NOW club is supporting in the upcoming elections, you can visit our Instagram @skylinenowclub! |

| SRC modified announcement | NOW modified announcement |
|---|---|
| *(Bilsborrow did not edit the announcement and SRC did not agree to any modifications)* | The elections coming up on November 8th are very important. We encourage everyone capable to vote, to vote.  You can still register online at Michigan.gov. For more information, including who the NOW club is supporting in the upcoming elections, you can visit our Instagram @skylinenowclub! |

Plaintiffs argue that "Plaintiffs' announcement did not advocate for or against Proposal 3[,]" ECF No. 69, PageID.1976.  However, the announcement was drafted to ask students to "join[] us in our fight to

defeat Proposal 3[.]"  The announcement proceeded to argue to listeners that if the proposal passed, the health of women and children would be threatened, including legalizing late term and partial birth abortion. Plaintiffs position on the proposal was clear.  Their contention that this was not a subjective view or taking a position on Proposal 3 is not consistent with what any reasonable observer would conclude.[32]

In contrast, the NOW announcement (once modified by Bilsborrow to remove the subjective statement connecting the election to the overturning of *Roe v. Wade*) became an ordinary, viewpoint neutral voter drive, which the school could reasonably determine was not covered by the campaign finance rule and is an activity within the reasonable scope of a women's rights organization.  Again, the link to the voting guide and the message expressed in that guide is distinct from the message expressed within the announcement itself.  NOW's announcement does not reference a club meeting like many

––––––––––––––––––

[32] Compare how Plaintiffs characterized their own announcement to the court, claiming it did not actually contain any subjective opinion, while NOW's statement that "The elections coming up on November 8th are very important.  We encourage everyone capable to vote, to vote. For more information, . . . visit our Instagram" shows, in Plaintiffs' view, how NOW club "advertised its pro-Prop 3 propaganda over the school's PA system."  ECF No. 75, PageID.2178.

announcements do, but announcements were not strictly required to reference a meeting, so long as it was a club-related activity. *See, e.g.*, ECF No. 64-13, PageID.1001 (Republican Club hosted red, white, and blue spirit day); ECF No. 65-5, PageID.1598 (NOW fundraiser for Ukraine). No evidence whatsoever suggests that SRC could not simply have aired the exact same announcement as NOW's modified announcement, but with their own voter guide. ECF No. 64-2, PageID.735 (JB 146) ("If the Skyline Republican Club provided [a voter guide], I would post that, as well").

No reasonable jury could dispute that fair application of the rule to both proposed announcements could result in this outcome, without engaging in viewpoint discrimination. *See United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 357 (6th Cir. 1998) (the question is "whether the government's rules and its application of its rules are reasonably related to the government's policy objectives"). In other words, in light of the content of the proposed announcements, the administrator could reasonably say "this one can be fixed with just a tweak" and "this one can't be fixed as-is, so I'll instead offer the opportunity to edit and resubmit." Absent

any evidence that treatment was done with discriminatory intent, no jury could find that the difference in treatment was a constitutionally cognizable injury.

Thus, the question of whether the application of the rule was pretextual does not present a sufficient disagreement to require submission to a jury, and is "so one-sided" that Defendants must prevail as a matter of law. *See State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986)).

> 4. The remaining evidence presented is not relevant to the analysis.

The above conclusions are, in the end, fairly straightforward – Plaintiffs have only their own speculation to support the inference of viewpoint discrimination, which is insufficient to prevent summary judgment. But in their briefings, Plaintiffs amass an array of comments, complaints, and cherry-picked quotes and examples to try and blur the analysis and make a case for differential treatment. The court finds that no reasonable jury could rely on any of these to find for Plaintiffs, and to clarify the record, addresses each argument in turn.

           a.    *The other announcements do not show*

                   *viewpoint discrimination or apply to*

                   *the rule at issue.*

First, Plaintiffs present the court with an array of announcements the school aired and other instances that ostensibly show the school's bias against the Republican Club.  ECF No. 65, PageID.1071; ECF No. 1, PageID.11-19.  Plaintiffs insist that other viewpoints were represented throughout the school, but that Defendants "disallowed Plaintiffs to advertise their club, their club's position, and thwarted its work in the community, whereas other . . . clubs are [] allowed to advertise freely."  ECF No. 65, PageID.1058.  Indeed, many student groups published announcements, and some of those announcements could reasonably be interpreted as expressing a political viewpoint of some kind.[33]

But despite the many examples that Plaintiffs cite as evidence of viewpoint discrimination, it is primarily in Defendants' briefing and exhibits that the court is presented with the many examples of times

---

[33] Plaintiffs present these as alternative viewpoints to the Republican Club. The court takes Plaintiffs' framing of their argument on their terms.  ECF No. 1, PageID.19 ("it shows that Defendants allow some viewpoints to be represented, but not others.").

that Plaintiffs also, in fact, advertised their club and their club's

position on the morning announcements.  ECF No. 64-12, PageID.992-

94.  Noticeably missing from the examples in Plaintiffs' briefs are the

materially similar announcements submitted by Skyline Republican

Club, which aired just like any other group's did throughout the time

period at issue.  A smattering of examples are again collected here:

- *See* Student Action Senate (March 3, 2022): "This announcement speaks to all students who feel passionate about women's rights." (ECF No. 64-3, PageID.777)

- *and* (February 21, 2017) The Skyline High School Democrats of America are holding a postermaking session after school in Ms. Ducker's room today to spread awareness regarding the contributions Planned Parenthood makes to the health and well being of our society. Stop by to make a difference!  (ECF No. 65-4, PageID.1429)

- *But see* Skyline Republican Club (October 21, 2021): "Interested in defending our personal freedoms and the freedoms of others?  Interested in learning more about our wonderful Constitution and what makes America so special?  The Republican club is for you!" (ECF No. 64-13, PageID.1003)

- *and* Republican Club (November 11, 2021): "Interested in learning more about what conservatives stand for? Interested in learning more about our Constitution and how it makes America so great?  Interested in understanding why we believe in what we believe such as limited Government? . . ." (ECF No. 64-13, PageID.1001).

- Or *compare*: Gay, Straight, Romanticality Alliance (April 21, 2022): "Across the US, LGBTQ+ students and their allies [are

taking] a vow of silence to protest the harmful effects of discrimination, harassment, and erasure of LGBTQ+ people in schools." (ECF No. 65-5, PageID.1608)

- *And*: The Black Student Union (February 25, 2022): "Happy Black History Month! Today's theme for Black History Month Spirit Week: Black and Red Solidarity Day. . . ." (ECF No. 65-5, PageID.1605)

- *With*: Republican Club (February 17, 2022): "In honor of Presidents day the Skyline Republican club would like you to join us in honoring our past and current presidents by wearing RED White and BLUE this Friday." (ECF No. 64-13, PageID.1001)

*See also supra* Section III.D.ii (collecting more examples of various announcements).

The mere fact that the school aired "political" announcements from other clubs says nothing about alleged viewpoint discrimination when the school also aired materially equivalent "political" announcements from the Republican Club. And none of these announcements implicate the rule about specific ballot measures or candidates, so are only tangentially relevant in the first place.

Similarly, Plaintiffs' references to NOW's announcement asking students to "stand in solidarity by wearing pink in support of the 1973 Roe vs. Wade court decision" are beside the point. *See* ECF No. 65, PageID.1070. The airing of that announcement fails to show viewpoint discrimination under the school's rule against advocating for or against

election issues because 1) when that announcement was aired in December 2021, there was no Proposal 3 on the ballot (and *Roe v. Wade* was still good law), so the announcement did not implicate the campaign finance rule, and 2) even accepting that the announcement expresses a viewpoint contrary to Republican Club, there is no dispute that Nielsen and the Republican Club also used the announcements to advocate for students to wear particular clothing in support of their viewpoint.  ECF No. 64-13, PageID.1001 (SRC's red white and blue day).

Similar problems apply to Plaintiffs' invocation of quotes pulled out of context to argue that the Student Action Senate was allowed to air an announcement "to all students who feel passionate about women's rights" referencing "upcoming protests and projects in favor of women's rights."  *See* ECF No. 65, PageID.1071.  That announcement was actually advertising a particular presentation on the history of feminist protest activity:

> This announcement speaks to all students who feel passionate about women's rights.  This Friday from 2:45-3:30 pm in room A40, the club students in government will be doing a presentation on the feminist movement and women's history in America to precede upcoming

protests and projects in favor of women's rights.
These events will be facilitated by students
in government.  Please join us for cookies, soda,
and feminism.  (ECF No. 64-3, PageID.777 (AAPS
106)).[34]

In contrast, the submitted draft of Republican Club's

announcement had no mention of a club meeting or school-related or

club related activity at all (outside of the "fight" to defeat Prop 3).  ECF

No. 64-2, PageID.729 (JB 125).[35]

So too are Plaintiffs' various references to the Planned Parenthood

Peer Educator program a red herring.  *E.g.*, ECF No. 65, PageID.1071.

The Peer Educator program announcements do not matter to the

viewpoint discrimination analysis because they were government

speech, not school-sponsored speech.  The unrebutted evidence shows

that announcement came from the district communications office and

---

[34] To the extent Plaintiffs object to an announcement speaking directly to
interested students, Skyline did not discriminate on that basis.  *See* ECF No. 65-5,
PageID.1595 ("Attention all singers, rappers, writers, and music producers:
Songwriting Club meets today after school . . ."); ECF No. 64-13, PageID.1001
("Interested in learning more about what conservatives stand for? . . . Come to the
Skyline Republican Club").

[35] Defendants admit that Nielsen stated that the purpose for the
announcement was to attract students to help with canvassing and handing out
literature at potential student-led events prior to and on election day, but the
submitted announcement made no reference to these efforts or events.  ECF No. 68,
PageID.1879 (citing ECF No. 64-5, PageID.899 (SN 49-51)).

the Skyline health teacher, not a student club, and the school/district

was thus choosing to advertise a community program of its own accord.

ECF No. 64-4, PageID.843 (CM 132) (Planned Parenthood volunteering

announcement came from a district content lead, sent to all high

schools, forwarded by the health teacher to McElmeel, and McElmeel

shared the message); ECF No. 65-5, PageID.1581 (announcement did

not direct students to a club but to the health teacher).  The Peer

Education program announcements were also aired alongside the other

"school-submitted" announcements.  Because it was government speech,

the school and district were free to make the choice to air it, even

assuming that choice took a particular viewpoint.  *See Rosenberger v.*

*Rector and Visitors of the University of Virginia*, 515 U.S. 819, 833

(1995) (when the government speaks it may "say what it wishes");

*Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir.

2000) ("When a public high school is the speaker, its control of its own

speech is not subject to the constraints of constitutional safeguards and

forum analysis, . . . ."); *Freedom from Religion Found., Inc. v. City of*

*Warren*, 707 F.3d 686, 697 (6th Cir. 2013).  Skyline's airing of the

Planned Parenthood volunteer opportunity as its own speech makes

that announcement constitutionally irrelevant to the question of whether it permitted student clubs' announcements to air on equal terms in the forum for school-sponsored speech.[36]

The same applies to a rainbow flag mural on the school's hallways that Plaintiffs, for somewhat opaque reasons, take issue with. ECF No. 65, PageID.1072 ("Defendants allowed a pro-LGBTQ+ viewpoint to be painted on the wall of Skyline High School's entryway to promote the school as safe space."); ECF No. 65-8, PageID.1834 (mural is a rainbow flag and says "Safe Space"). Plaintiffs barely attempt to connect this fact to their forum analysis, and do not allege that the school hallways were themselves a forum open to student submissions. If the mural was government speech, the school is allowed to make choices about what murals it puts on its walls, and those choices have nothing to do with whether the school discriminated within the nonpublic forum

---

[36] Plaintiffs do not address the other "teacher-submitted" announcements in their briefs, though the League of Women Voters announcement was raised in their complaint. ECF No. 1, PageID.17-18. It is enough to say here that, if they were government speech, then they do not implicate viewpoint discrimination at all. And even assuming some sort of forum was created for teacher-submitted announcements (which the court has no evidence on), then their content still does not implicate the rule against specifically advocating for one side on a current ballot issue or candidate.

created by the morning announcements.[37]  *See Ind. Univ. Chapter of Turning Point USA v. City of Bloomington*, 641 F. Supp. 3d 548, 561-62 (S.D. Ind. 2022) (concluding that City's Black Lives Matter street murals were government speech, and so the City did not have to allow plaintiffs to paint an "All Lives Matter" mural).  If it was some sort of forum, on the other hand, then Plaintiffs make no allegation that they ever tried to submit a proposed mural for the school to put up, and so have no evidence showing differential treatment.  *See Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 466 (7th Cir. 2001) (using forum analysis for school hallway murals).[38]

Because Republican Club received the same treatment generally, the issue becomes only whether Republican Club was treated differently as to the application of *this specific rule*, and as explained, Plaintiffs have no real answer on that point.

---

[37] "[T]he record is silent as to who painted the wall, when and why it was painted, and who approved it."  ECF No. 68, PageID.1878.

[38] To the extent Plaintiffs sometimes try to treat the school as one big forum, forum analysis still requires comparing apples to apples (i.e. they can't point at government speech as an example of viewpoint discrimination).  If one group got to make a mural, the question is whether the school was deliberately opening a forum for school-sponsored speech.  *See Kincaid v. Gibson*, 236 F.3d 342, 349 (6th Cir. 2001) (en banc) (government must have intended to create some sort of forum for forum analysis to apply).  Plaintiffs offer no evidence to show that.

b.   *The student walkouts do not show viewpoint discrimination or apply to the rule at issue.*

Next, both on this motion and at the TRO hearing before Judge Borman, Plaintiffs represented that the school "allowed," "facilitated" and "organized" walkouts by pro-choice groups.  ECF No. 65, PageID.1056; *id.* at PageID.1078; ECF No. 7.  Because those happened on school grounds, Plaintiffs seem to say they were in some way approved by the school, and this proves the school's differential treatment of opposing viewpoints.  *E.g.*, ECF No. 65, PageID.1075.  And indeed, some student groups walked out of school to oppose the loss of abortion rights; as explained above, however, the school does not in a meaningful way "facilitate," endorse, or organize these walkouts.  Staff stand outside to keep an eye on the minors who have left the school building without permission, students are marked absent if they miss class, and staff refused to even offer students access to a bullhorn to help make their point.  *See supra* Section III.F.iii; ECF No. 64-4, PageID.848 (CM 151).  There are long leagues of difference between supporting or sponsoring students' speech at a student-run protest, and

standing by and looking on for safety.  The mere presence of administrators nearby, and occurrence on school grounds, do not alone transform an activity into a school-sponsored activity (the same way, say, if an entire classroom of students refused to stand for the Pledge of Allegiance, that protest would not be considered "approved" by the school).  *See C.S. v. McCrumb*, 728 F. Supp. 3d 581, 597 (E.D. Mich. 2024) (noting the *Tinker* standard would apply to "students who refuse to recite the Pledge of Allegiance").

And once again, almost entirely missing from Plaintiffs' briefings is that the Republican Club organized a walkout to oppose masking during COVID,[39] which occurred on the same terms as any other walkout.  *See supra* Section III.F.iii.  The only time Plaintiffs even reference their own walkout, organized by Nielsen earlier that same year, is buried in a footnote of their counterstatement of facts, where they state only that "[t]he student walk-out to protest masking held

---

[39] Plaintiffs' counsel contested at oral argument that the record was clear on this point, so the court will point out that Nielsen, while President of the Republican Club, organized it.  ECF No. 64-5, PageID.905 (SN 75-77).  And Skyline Republican Club members participated and "supported views similar to the walkout."  *Id.*  Whether or not it was officially a "Republican Club"-sponsored event, it represented Republican Club's views, which is the relevant point to the analysis.

during the previous schoolyear was not 'identical' to Plaintiffs' Pro-

Proposition 3 Rally."  ECF No. 69, PageID.1971, 1973.  Granting that

two walkouts at two different times about two different topics are not

"identical" in the absolute strictest sense of the word, why the two

walkouts are not materially similar for purposes of evaluating possible

viewpoint discrimination is never explained.[40]  But no reasonable jury

could conclude that differential treatment occurred; the school

distributed materials to teachers reminding them of the school's

viewpoint neutrality when GSRA organized a pro-Prop 3 walkout; they

did the same for Nielsen and the Republican Club in 2021 when he

organized a walkout to protest mask mandates.  ECF No. 64-8,

PageID.979; ECF No. 64-22, PageID.1031; *supra* Section III.F.iii.  Thus,

even if the court accepted Plaintiffs' arguments that the walkouts were

in some way school-approved (it does not, *see M.C. Through Chudley v.*

*Shawnee Mission Unified Sch. Dist. No. 512*, 363 F. Supp. 3d 1182, 1200

(D. Kan. 2019) (walkout not considered school-sponsored speech where

---

[40] For example, Nielsen made a digital flyer advertising the event and
distributed it via text message (PageID.905, SN 77), the same way NOW/GSRA
advertised their walkout.  *Id.* at PageID.906 (SN 78) (other people received
NOW/GSRA's digital flyer via text message); ECF No. 65-7, PageID.1831 (example
of text message receiving "flyer" about the pro-Prop 3 walkout in November 2022).
No announcements were aired about them.

school district made clear the walkout was optional and disclaimed all

sponsorship of the event)), the point would still run aground for lack of

differential treatment.

> c. *The personal opinions of*
>
>    *administrators do not raise genuine*
>
>    *issues of fact.*

Plaintiffs also make much of a few messages between

administrators from which a reasonable reader can, to be fair, infer that

they did not hold a high opinion of Nielsen.[41]  They argue, in essence,

that these show that administrators were biased in favor of the

students who participated in the pro-Prop 3 protests.[42]  And in the light

most favorable to Plaintiffs, the texts give the impression that at least

---

[41] *See* ECF No. 65-3, PageID.1263 (Text from Cory McElmeel: "FYI - Soren has checked 10 LGBTQ books out of the library and has alluded to staff that is something he plans to address next", followed by text from Jeanice Swift: "OH Dear God in heaven!!"); *see also* ECF No. 65-3, PageID.1331 (email from Bilsborrow relating how the announcement was read in accordance with court order).

[42] *See* ECF No. 75, PageID.2179, directing the court to the quote in note 41, and a chain of texts on the walkout itself.  In this second chain, the superintendent responded "PERFECT!" when told that the pro-Prop 3 walkout will happen during announcements, which Plaintiffs say shows that she was biased against the announcement.  ECF No. 65-3, PageID.1258.  Perhaps, but she also replied "perfect" to other texts, too, like when she asked McElmeel for additional information and he replied, indicating that she may just have been acknowledging the information he was passing along.  *Id.* at PageID.1261.

some administrators held opposite views to Nielsen on the political issues he chose to speak about.

But the record also contains a broad array of evidence that, whatever their personal opinions about Nielsen, or the Republican Club, or their views, administrators did not actually use their positions to treat Nielsen or the Skyline Republican Club any differently from other students or student groups for purposes of the morning announcements – in other words, that there was no relevant state action taken in support of their personal beliefs and discriminating against Plaintiffs. *See* 42 U.S.C. § 1983 (requirement that for liability to attach, a right must be deprived "under color of" state law). Administrators were not required to personally agree with the announcement Plaintiffs wanted to air or with Plaintiffs generally; for purposes of liability in this case, they were simply not allowed to use their power over the nonpublic forum to discriminate against Plaintiffs within that forum on the basis of viewpoint. Their messages do not raise a genuine dispute of material fact on that issue.[43]

---

[43] Plaintiffs also argue that their "announcement was read, . . . in a less than enthusiastic tone, with an audible sigh, and with the omission of the word 'birth' from the announcement." ECF No. 65, PageID.1078. Perhaps recognizing the

> d.   *References to underlying messages*
>      *which were themselves political do not*
>      *show viewpoint discrimination.*

Next, Plaintiffs argue that Skyline treated SRC differently from

other clubs because "Defendants read a public announcement and

approved a flyer that was hung on the Skyline bulletin board from the

[NOW] Student Club that advised students who to vote for and how to

vote on Proposal 3." *Id.* That is not exactly what happened.

Defendants read a public announcement from NOW that advised

students to *go to NOW's Instagram page* to find out NOW's positions,

and if someone actually went to their social media feed, the post linked

to their voting guide on particular candidates and proposals. *See* NOW

Voting Guide, ECF No. 65-5, PageID.1577. And Defendants did

apparently allow NOW to also post a flyer that had a QR code on it that

---

weakness of this point, it is relegated to a statement of fact, and is only mentioned
in passing once more. ECF No. 75, PageID.2178. Several problems exist here – was
the student reading the announcements that morning a state actor? Plaintiffs do
not say. If so, is skipping over a word, apparently by accident, or mere tone of voice
and level of enthusiasm – even assuming there was any difference at all – a
cognizable injury under the First Amendment? No authority is cited for that
proposition. The court considers this argument undeveloped and ignores it. *Vander
Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014) (undeveloped
arguments are deemed abandoned).

directed readers to the same voting guide (*see id.* at PageID.1576 (QR code)).[44]

First, the mere fact that NOW was permitted to direct students to their voting guide on current ballot issues was not inconsistent with the school's stated rule. Directing listeners to a third-party site via a link over an PA system is very different from affirmatively making the linked message in the announcement itself. *See Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044, 1053 (9th Cir. 2003) ("The [School] District cannot refuse to distribute literature advertising a program with underlying religious content where it distributes quite similar literature for secular summer camps, but it can refuse to distribute literature that itself contains proselytizing language. The difference is subtle but important."). For example, a stand-up comedy student club might reasonably not be allowed to air crude jokes over the announcements to advertise their club, *see Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986), but could probably, under the rules in this case, use the announcements to say, "Interested in doing stand-up? Join the

---

[44] These too were school-sponsored speech and a nonpublic forum; the school approved flyers with a smiley-face stamp to indicate its approval before they could be posted on the bulletin boards. *See* ECF No. 65-7, PageID.1699 (SN 46).

Club on the theater stage after school, and to learn more about what we do, visit our Youtube channel" (where viewers could access their uncensored stand-up sets, and the speech contained in those videos could not reasonably be attributed to the school). *See* ECF No. 64-13, PageID.1001 (example of similar Republican Club announcement).[45] The fact that the school permitted NOW to use QR codes to link to their voting guide, and that literature itself made explicit endorsements in the 2022 election, does not mean that NOW got special access to the school's nonpublic forum, particularly when unrebutted evidence shows that the Republican Club could simply have done the same had it asked, and had in fact also directed students to their Instagram page using the announcements. *See* ECF No. 65-7, PageID.1699 (SN 46) (Republican Club was never prevented from putting up flyers); ECF No. 64-13, PageID.1003 (Republican Club had also aired announcements that directed students to their Instagram page); ECF No. 64-2, PageID.735 (JB 146) ("If the Skyline Republican Club provided the same, I would post that, as well"). The district repeatedly offered to

---

[45] The same goes for SAS's event merely referencing the history of feminist protest activity preceding "upcoming protests;" the underlying message of any protest is separable from the announcement of a presentation that would include discussion of that protest. *See* ECF No. 64-3, PageID.777 (AAPS 106).

work with Nielsen and the Republican Club to craft such an announcement.  ECF No. 65-3, PageID.1254; ECF No. 64-2, PageID.719 (JB 85); ECF No. 64-4, PageID.853 (CM 171) ("They never responded to any of our requests to work with them on a message.").  Plaintiffs do not argue that SRC proposed a similar announcement or flyer and were refused,[46] so cannot show differential treatment.  A plaintiff claiming viewpoint discrimination cannot complain that their speech was subject to discriminatory treatment if they do not show that they ever, in fact, tried to speak at all.  *See Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech").

It is for this same reason that the announcement by the National Honor Society announcing Congresswoman Debbie Dingell's event is also irrelevant.  *See* ECF No. 65, PageID.1071 (claiming, that because

---

[46] Plaintiffs do briefly argue that they put up flyers that were "torn and defaced."  ECF No. 69, PageID.1976; *see* ECF No. 65-3, PageID.1190 (AAPS 170-71). But that point is not relevant to what the school or any school officials did; there is no allegation that school officials in some way discriminatorily failed to respond to that, and the acts of fellow students are not at issue in this case.  *See* ECF No. 65-7, PageID.1744 (Nielsen attributes the act to a fellow student); § 1983 (again, for liability to attach, a right must be deprived "under color of" state law).

Dingell is a Democratic elected official, this shows bias against the Republican Club).  The announcement about a sitting Congresswoman's visit made no reference to her candidacy in the 2022 election or any ballot initiative, but rather advised students she would be speaking about "getting better leadership skills" and "how to take action for something you believe in."  ECF No. 65-5, PageID.1487 (CM 199); ECF No. 64-4, PageID.839, 860 (CM 115, 200).[47]  Student groups were free to advertise the fact of her coming to speak (while the underlying message she may have chosen to communicate is separable from the announcement itself), just as the Skyline Republican Club could have invited a Republican congresswoman to come speak, and the school would have aired an announcement about that event.  ECF No. 65-9, PageID.1841-42 (Bilsborrow to Nielsen: "if we had a Republican congressman here too[,] we would make that announcement").  The fact that the school allowed a club to advertise the fact of her visit did not implicate the rule against advocating for or against current ballot initiatives, and is irrelevant to this analysis.

---

[47] Dingell's visit was subsequently cancelled.  ECF No. 64-4, PageID.839 (CM 116).

> e.   *The SRC being an approved/not*
>      *approved club is not relevant to the*
>      *constitutional analysis.*

One final issue raised in the briefings is not contested by
Plaintiffs, and it can be put to the side – the court only raises the point
to clarify its relevance.  The parties have disputed in part whether SRC
was an approved club the morning their announcement was first
denied, and whether the announcement was denied (at least initially)
based on the failure to become an approved club before submitting the
announcement.  *See* ECF No. 64, PageID.686; ECF No. 69, PageID.1974
n.12.  Defendants have consistently said that the initial reasoning for
denying the announcement that morning was the approval process.
*See, e.g.*, ECF No. 64-28, PageID.1047; ECF No. 64, PageID.686.

Ultimately, the debate does not matter.  Even if you assume that
on the first day, the school denied the announcement based on the
timing of SRC becoming "approved" (say: becoming approved about five
minutes before announcements aired missed the cutoff), then their
reliance on that rule would not be a constitutional problem.  Schools can
set reasonable rules in light of the purposes of the forum, such as "only

approved student clubs can submit announcements." *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) ("The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups . . . ."). But the school still refused to air the announcement the next day, citing the campaign finance rationale – so that rationale is the one at issue in the case.

Or assume that's wrong, at least in part: as Laurie Adams' email said, before announcements were read, "The club is back on the list but your announcement is not going to be read[.]" ECF No. 65-4, PageID.1424 (accepting that as accurate, showing that the approval issue went away before announcements were aired that morning). There is still no evidence showing that the school's statements referring to the approval process do not simply accurately reflect the timeline of submitting the announcement that morning. All parties testified that the club was not yet approved at the time the announcement was submitted, which was earlier that same morning. *See* ECF No. 64-5, PageID.917 (SN 125) ("They said [the approval] was still pending. . . We were in the process of getting everything approved."); ECF No. 64-15,

PageID.1012 (announcement submitted at 7:41 am). When the announcement was submitted via google form, some sort of indication was given that SRC had not yet completed the approval process. ECF No. 64-12, PageID.990 (JB Affidavit) ("The announcement request admitted that the Skyline Republican Club had not yet completed the approval process"). And the actual process of confirming SRC's approval ran very close to when the announcements aired; Adams' email noting the club was "back on the list" was sent a mere five minutes before announcements aired, at 9:11 am. ECF No. 65-4, PageID.1424. It is therefore accurate to say that the "initial" reason for denying the announcement was that SRC was not yet an approved club, but once they were an approved club, the announcement was denied on its substance. *See* ECF No. 64, PageID.686. The school has never disputed that the approval issue did not apply to the next day; subsequently, Skyline Republican Club was recognized as a student club and their announcements could be submitted and would be read like any other student club. ECF No. 64-28, PageID.1047. And Plaintiffs admit that the rule requiring clubs to be approved "is not a material fact in this case, as it is undisputed that Plaintiff Skyline

Republican Club was an 'approved club' as of the morning of October 21, 2022 and Defendants did not air their announcement from October 21-November 4, 2022."  ECF No. 69, PageID.1974.

The court agrees; there is no genuine dispute that, starting just before announcements were aired on October 21, 2022, the sole reason for denying the announcement was the campaign finance rationale, and that is the rationale for this court to consider.  ECF No. 65-4, PageID.1424.

### 5.    Summary

In sum: the record reflects consistent, neutral treatment by the school, not viewpoint discrimination.  No reasonable jury could find that Skyline discriminated against the Republican Club on the basis of viewpoint when it refused to air their announcement as submitted, and instead offered to engage in a collaborative editing process, because 1) the policy that the school cited to deny the announcement was an existing, viewpoint-neutral policy, 2) the school used exactly the same process as to a club submitting an announcement with the opposite viewpoint and refused to air the offending portion of their

announcement as well, and 3) Skyline's treatment of the announcement
was consistent with the stated policy.

> c)   The policy is reasonable in light of the purposes of
> the school's morning announcements.

Given that the school did not engage in viewpoint discrimination,
the only remaining question is whether, even though it was applied
neutrally as to viewpoint, the school's content-based restriction on
electioneering on an upcoming ballot measure was a reasonable
restriction in light of the purposes of the morning announcements. *See*
ECF No. 65, PageID.1084.  This is a question of law for the court to
decide. *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989).

Put more simply: can a public high school implement the following
rule: "no using the morning announcements to make political campaign
ads telling other students how to vote in an upcoming election?"  It can.

In a nonpublic forum, the state can engage in "content
discrimination, . . . if it preserves the purposes of that limited forum"
(and does not discriminate on the basis of viewpoint). *Rosenberger*, 515
U.S. 819, 830 (1995).  First, the school could reasonably fashion a rule
in a nonpublic forum consistent with its understanding of Michigan

campaign finance law.  Second, there are legitimate pedagogical reasons to not open the morning announcements to electioneering.

1.    Reliance on the Michigan Campaign Finance Act is reasonably related to the purposes of the forum and addresses legitimate pedagogical concerns.

The school argues that "The Michigan Campaign Finance Act ("MFCA") prohibits the District from contributing to or expressly advocating for a ballot question or candidate for public office."  ECF No. 64, PageID.684.  The court notes that it is not actually necessary to determine if the MCFA does in fact prohibit a school from permitting a student club to advertise its views on an upcoming ballot measure on the morning announcements.  For purposes of this motion, it is sufficient to say that in its morning announcements, the school can reasonably make the determination that avoiding the appearance of conflict with the MCFA is a reasonable restriction in light of the purposes of the forum.  *See Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist.*, 941 F.2d 817, 828 (9th Cir. 1991) ("[S]chool authorities have legitimate educational interests in assuring that '. . . the views of

117

the individual speaker are not erroneously attributed to the school.'")

(citing *Hazelwood*, 484 U.S. at 271). A school "must retain the authority to refuse to sponsor speech that might reasonably . . . associate the school with any position other than neutrality on matters of political controversy." *Hazelwood*, 484 U.S. at 272. Skyline has a legitimate educational interest in ensuring that, within its school-sponsored speech, the views of its politically active student groups are not accidentally attributed to the school on active ballot measures or candidates, which, given a community with a wide variety of political viewpoints, the school reasonably prefers to remain studiously neutral on (and believes that it is statutorily required to remain studiously neutral on).

> 2. The school may reasonably decide not to permit electioneering over the morning announcements.

Second, independent of its concerns around appearing to violate the Campaign Finance Act, Skyline also cites concerns that allowing announcements of this kind would disrupt the learning environment. ECF No. 64, PageID.667. That, too, is reasonably related to legitimate

pedagogical concerns. *See Planned Parenthood of S. Nevada, Inc. v. Clark Cnty. Sch. Dist.*, 941 F.2d 817, 829 (9th Cir. 1991) (disassociating from speech inconsistent with educational mission and avoiding the appearance of endorsing political views are legitimate pedagogical concerns).

As McElmeel and Bilsborrow explained it, the policy was that announcements had to be short, contain relevant information about school activities, be appropriate for school setting, not air too frequently, and follow the campaign finance rule. Thus, in place was a relatively narrow rule that student clubs could announce their events or related activities they were doing, and even do a little advertising about the political bent their club takes – but may not electioneer about specific ballot issues or candidates in advance of an election. That rule is not unreasonable in light of the purposes of the forum. A school may reasonably decide that its morning announcements are only meant as a space to quickly advertise club-related activities, not a free-for-all public forum for whatever viewpoint-related speech their students hope to

advertise.[48]  It may reasonably keep announcements to a basic format: notifying students about something the club is doing and some text related to that activity.  *See* ECF No. 64, PageID.667 (airing announcements like this could cause "disruption in the school and learning environment."); *id.* at PageID.684 (citing interest in "maintaining a civil learning environment").  It bears reminding that as submitted, Republican Club's announcement *did not reference any club activity at all* – its sole purpose was to make that advocacy, and thus did not meet either the requirement of not advocating for a ballot issue or relevancy to club activities (except for SRC's general "fight to defeat" Prop 3, which ran into the school's campaign finance rule).

       If it were the case that the school were required to accept SRC's format of announcement, what would happen when every student club follows up the Republican Club's announcement with an opposing endorsement?  Would the start of every second period at Skyline become a litany of these kinds of submissions, for however many causes and

_____

[48] The record also reflects that most students, and even most high school seniors, are not even old enough to vote by a given fall election (only 35 Skyline students were eligible to vote at the time of the announcement), though the court does not consider that particularly probative.  *See* ECF No. 64-2, PageID.747 (JB 194).

candidates any student group decides to endorse?  *See Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist.*, 941 F.2d 817, 829-30 (9th Cir. 1991) (school's decision to avoid "caus[ing] tension and anxiety between teachers and parents, and between competing groups such as [Planned Parenthood] and pro-life forces" is a reasonable one"); *Perry*, 460 U.S. at 52 (in nonpublic forum, school can legitimately seek to ensure the forum does not become a "battlefield for inter-[group] squabbles").

The school could – and did – reasonably make the judgment that these types of announcements 1) are not sufficiently related to school-sponsored activities and that 2) they run the risk of making it appear that the school is supporting the particular positions advocated on current electoral issues.  The Constitution does not require that the school open its PA system to become a school-sponsored stage for political endorsements every election season.  *Planned Parenthood*, 941 F.2d at 829 ("A school's decision not to promote or sponsor speech that . . . might place it on one side of a controversial issue, is a judgment call which *Hazelwood* reposes in the discretion of school officials and which is afforded substantial deference.").  To the extent that it may seem odd

to Plaintiffs that this rule permitted student-submitted announcements related to, for example, celebrating the anniversary of *Roe v. Wade* (ECF No. 65, PageID.1070), but banned specifically advocating for or against a ballot proposal which would constitutionalize *Roe*-like protections in Michigan, that line-drawing in a nonpublic forum is not constitutionally impermissible.  "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation."  *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 808 (1985) (emphasis in original); *Planned Parenthood*, 941 F.2d at 829 (in nonpublic forum analysis the judgment of school officials is entitled to deference); *Curry v. Hensiner*, 513 F.3d 570, 579 (6th Cir. 2008) ("we are not called upon to evaluate whether the principal made the *best* decision in disallowing the card," but simply whether the decision violated the First Amendment).

Moreover, it is worth remembering that Skyline students are not prevented from sharing their speech by the narrow rule regarding submissions to the morning announcements; Plaintiffs were free to make their points in the specific way they wanted to at a club

meeting,[49] on their social media accounts, by texting other students, by advertising their social media accounts on the announcements, by using a QR code on a flyer, or organizing a protest or walkout. *See* ECF No. 64-2, PageID.717 (JB 75) ("clubs can do whatever they want, but their *announcements* have to be relevant to the student body and staff and building and activities within the building") (emphasis added); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (although not actually necessary to consider in nonpublic forum analysis, one factor considered in First Amendment doctrine generally is whether the restriction "leave[s] open ample alternative channels of communication"); *Planned Parenthood*, 941 F.2d at 830 (school could "reasonably choose to have the family planning debate take place in the classroom rather than in the advertising pages of its school-sponsored publications"). And for that matter, even under the rule they were free to simply make their own "voting guide," and air an announcement directing students to it, as NOW did.

---

[49] Like hosting a poster-making session and advertising the meeting to do that. *See* ECF No. 65-5, PageID.1615 (Skyline Democrats poster-making session in 2017 to spread awareness about Planned Parenthood).

Therefore, the morning announcements are school-sponsored speech.  The content-based rule banning speech that tells students how to vote on particular ballot measures or candidates is reasonable in light of the purposes of the morning announcements, and no reasonable jury could find that the rule was applied discriminatorily with regard to viewpoint.  Summary judgment is **GRANTED** to Defendants as to Count I.

### ii.   *Unconstitutional Prior Restraint (Count II)*

Plaintiffs' motion as to their prior restraint claim is woefully underdeveloped.  Their argument is, almost in its entirety, that Skyline's policies unconstitutionally allow Bilsborrow "to make subjective decisions whether or not to restrict student speech, not based on clear and objective criteria, but based on personal opinion or discretionary veto."  ECF No. 65, PageID.1084.  In their motion, they briefly cite two Supreme Court cases for general statements on prior restraint (but which bear no similarity to this case) and make no effort to find or apply similar factual cases.  *See* ECF No. 65, PageID.1084-85.  In their response and reply briefs, they add more color to the argument, but still fail to prove their case.  For example, Plaintiffs cite *Lowery v.*

*Euverard*, 497 F.3d 584, 588 (6th Cir. 2007) for the proposition that "school officials do not have unfettered authority to regulate student speech," but provide no explanation as to its relevance.  ECF No. 75, PageID.2177.  *Lowery* involved materially different facts; the parties there agreed that the *Tinker* standard governed the speech at issue (high school football players signing a petition to protest allegedly abusive treatment by the head coach), but this case is not governed by the *Tinker* standard and addresses school-sponsored speech, with narrower protections.  *See Lowery*, 497 F.3d at 588.[50]  Plaintiffs make no effort to explain how the general principle that school officials do not have "unfettered" authority to restrict speech applies to school-sponsored speech (which schools have at least some level of inherent authority to restrict), nor, applying the general principle to the facts of the case, why a school cannot appoint a school secretary to review student submissions to the morning announcements for particular content before airing them.  Their argument would seem to lead to the conclusion that the school, once it has offered students the opportunity

---

[50] And even though *Tinker* applied in *Lowery* and the petition was student speech, the Sixth Circuit still found no constitutional violation in the school's regulation of the speech at issue.  *Lowery*, 497 F.3d  at 600-01.

to request announcements to be aired, has *no* authority to regulate those announcements whatsoever, a conclusion that rebuts itself.

Plaintiffs' citation to *Coleman v. Ann Arbor Transp. Auth.*, 904 F. Supp. 2d 670, 688-98 (E.D. Mich. 2012) gets the closest to making their case, but still is left unexplained. *See* ECF No. 69, PageID.1993. That case found the Ann Arbor Transport Authority's restriction that advertisements on buses be in "good taste" and "aesthetically pleasing" was unconstitutionally vague. But Plaintiffs' conclusory statements that "Defendants' policies and protocols invited arbitrary and discriminatory enforcement" make no serious attempt to apply that void-for-vagueness principle to the actual policy at issue here: whether the school's policies against speech advocating for or against a ballot item in an upcoming election, and requiring announcements to be short, relevant to school events, and informational, grants Bilsborrow "unbridled discretion over [the] forum's use." *See Coleman*, 904 F. Supp. 2d at 691; ECF No. 69, PageID.1993. Plaintiffs' motion for summary judgment on this point must therefore be denied. However, the question again still remains whether Defendants have met their burden to prove that they are entitled to summary judgment.

126

As explained, the school can put reasonable restrictions on announcements under *Hazelwood*: "The lack of an 'unfettered right to restrict speech,' merely refers to the aforementioned well-settled principle that a 'school's restrictions on speech reasonably related to legitimate pedagogical concerns must still be viewpoint neutral.'"  ECF No. 68, PageID.1892 (quoting *Hansen v. Ann Arbor Pub. Sch.*, 293 F. Supp. 2d 780, 797 (E.D. Mich. 2003).  Put differently: "prior restraints in a *nonpublic* forum, . . . traditionally differ from those in public forum," and restrictions on speech must be evaluated with the recognition that editorial control is inherent in the nature of the forum.  *See Flores v. Bennett*, 635 F. Supp. 3d 1020, 1044 (E.D. Cal. 2022) (emphasis in original).  In a nonpublic forum like the morning announcements, a school may "exercise editorial control" over speech that "might reasonably" bear the "imprimatur of the school" so long as its actions in doing so "are reasonably related to legitimate pedagogical concerns."  *See Hazelwood*, 484 U.S. at 271-73.  The mere fact that the school did edit announcements pre-publication is not unconstitutional.

This leaves only Plaintiffs' argument that the school's policy as to announcements gave Bilsborrow too much discretion.  But "[t]he

unbridled discretion inquiry is not a static inquiry, impervious to context[.]" *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch.*, 457 F.3d 376, 387 (4th Cir. 2006) (citing *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 94-95 (1st Cir. 2004)) (cleaned up).  A "grant of discretion to exercise judgment in a non-public forum must be upheld so long as it is 'reasonable in light of the characteristic nature and function' of that forum." *Ridley*, 390 F.3d at 95.  As explained above, the restriction on the forum was reasonable, the school was not required to have a written policy identifying the specific items that the school could legitimately edit out of announcements, and Plaintiffs have no evidence that the announcement submission system operates in practice to discriminate on the basis of viewpoint.  *See Hazelwood*, 484 U.S. at 273 n.6 ("We reject [the] suggestion that school officials be permitted to exercise prepublication control over school-sponsored publications only pursuant to specific written regulations.").  Nor is there any evidence to suggest that a policy against speech advocating for or against a ballot item in an upcoming election is so vague or devoid of any objective criteria as to invite abuse by the official vested with the authority to enforce it.  *See Child Evangelism Fellowship*, 457 F.3d 376,

387 (4th Cir. 2006) (policies in nonpublic forums should simply "provide sufficient criteria to prevent viewpoint discrimination"). In fact, the evidence shows that Skyline only edited or denied a total of two announcements under this rule, and the evidence supports the application of the policy to those announcements. Thus the school secretary's discretionary application of the announcements policy was sufficiently constrained by effective guardrails when the policy a) expressly prohibited viewpoint discrimination,[51] b) indicated that announcements should be short and about school events,[52] c) indicated that language that advocates for a particular political position on an election item is inappropriate for school-sponsored speech and should be edited out by reviewing administrators,[53] and d) there is no evidence that the relevant officials actually applied the policy unfairly based on viewpoint.[54]

---

[51] Bilsborrow was explicitly instructed that he had to treat the announcements equally and fairly. ECF No. 64-2, PageID.712 (JB 55); *see Southworth v. Bd. of Regents of the Univ. of Wis. Sys.*, 307 F.3d 566, 591 (7th Cir. 2002) (upholding regulations "that expressly prohibit viewpoint discrimination").

[52] *See supra* Section III.F.ii (announcements policy).

[53] *See id.*; Section III.F.i (campaign finance policy).

[54] *See supra* Section V.B.i.b (analyzing viewpoint discrimination).

Defendants' motion for summary judgment as to Count II is

therefore **GRANTED**.[55]

### iii.    Equal Protection (Count III)

The Equal Protection Clause prohibits discrimination by the

government that "burdens a fundamental right, targets a suspect class,

or intentionally treats one differently than others similarly situated

without any rational basis for the difference." *Loesel v. City of*

*Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012). Disparate treatment

is a threshold requirement of an equal-protection violation. *Marie v.*

*Am. Red Cross*, 771 F.3d 344, 361 (6th Cir. 2014). Plaintiffs must prove

defendants intentionally treated them differently than similarly

situated individuals. *Hall v. Callahan*, 727 F.3d 450, 457 (6th

Cir.2013).

Plaintiffs argue that Defendants violated the Equal Protection

Clause by burdening their "fundamental right to free speech

_____

[55] While the court concluded that SRC has standing to pursue injunctive relief, they make no attempt to show what announcements, specifically, they plan to propose in the future and would be denied (and the record contains many announcements they have submitted that have been aired since this announcement was filed), so the court cannot engage in the "fact specific" inquiry over whether the First Amendment would protect that speech and whether it would be unconstitutionally restrained. *See Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 880 (6th Cir. 2024). Their claims for injunctive relief are therefore denied.

protected under the First Amendment."  ECF No. 65, PageID.1085.

This argument raises the question of whether this case, ostensibly

brought on behalf of a group of people but in fact regarding only a single

instance of allegedly unconstitutional conduct, should be treated as a

classification that infringes upon a fundamental right for a class of

people, or as a "class of one" claim, where Plaintiffs allege they were

"treated differently than other persons who were similarly situated and

that there exists no rational basis for such disparate treatment."  *See*

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quotation

marks omitted).  It is not clear which degree of scrutiny Plaintiffs argue

should be applied.  *See* ECF No. 65, PageID.1085 (Skyline's policies "do

not pass any level of scrutiny, lacking even a rational basis").

The court need not try to answer that question, however, because

Plaintiffs have not met their threshold burden of proving disparate

treatment.  As explained in detail above, Plaintiffs were not treated

differently than any other group in submitting announcements,

whether in general or under the specific rule at issue.  Skyline's actions

pass any level of scrutiny because Plaintiffs cannot identify similarly

situated individuals who were treated differently.

As a result, Defendants' motion is **GRANTED** as to Count III.

    *iv.*    *Equal Access Act (Count IV)* [56]

The Equal Access Act (EAA), 20 U.S.C. § 4071, makes it unlawful for a public high school to discriminate in a limited open forum against student groups on the basis of political viewpoint:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a).[57]

However, nothing in the act limits "the authority of the school, its agents or employees, to maintain order and discipline on school

---

[56] "[N]ominal damages are recoverable under the Equal Access Act through 42 U.S.C. § 1983." *Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake Cty.*, 249 F. Supp. 3d 1286, 1293 (M.D. Fla. 2017).

[57] Although it applies to political viewpoint as well, Congress passed the statute, in part, in response to perceived discrimination against religious groups in schools and to clarify that, in Congress' view, the Establishment Clause does not prevent permitting religious student clubs to meet on school premises during noninstructional time. *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 219 (3d Cir. 2003) (citations omitted).

premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary." § 4071(f).

For the EAA to apply to a given school three conditions must be met: (1) the school must be a secondary school; (2) the school must receive federal funding; (3) the school must have established a "limited open forum" by allowing other noncurriculum related groups to "meet" on school premises. *ALIVE v. Farmington Pub. Sch.*, No. 07-12116, 2007 U.S. Dist. LEXIS 65326, *8 (E.D. Mich. Sep. 5, 2007) (citing *Prince v. Jacoby*, 303 F.3d 1074, 1079 (9th Cir. 2002)). Many of the relevant terms are statutorily defined. "Limited open forum" is defined as whenever a "public secondary school . . . grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b). "Meeting" "includes those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." § 4072(3). "Noninstructional time" means "time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends." § 4072(4).

The parties do not dispute that Skyline is a federally funded secondary school and that the Republican Club is a noncurriculum related student group under the terms of the EAA.  Plaintiffs argue that Skyline violated the Act because 1) the morning announcements occur during noninstructional time and 2) because they were denied equal access to those announcements (ECF No. 65, PageID.1086-92); Defendants dispute both of those arguments (ECF No. 64, PageID.691).

As a preliminary matter, the court notes that the EAA has consistently been construed to protect more than just a traditional "meeting" of a club.  *See Bd. of Educ. v. Mergens*, 496 U.S. 226, 247 (1990) ("equal access in the form of official recognition [of a student club] . . . carries with it access to the school newspaper, bulletin boards, the public address system, . . ."); *Boyd Cty. High Sch. Gay Straight All. v. Bd. of Educ.*, 258 F. Supp. 2d 667, 683-684 (E.D. Ky. 2003) ("Equal access 'to meet' is broadly defined under the EAA to include all activities in which student groups are permitted to engage in a particular school.").  The court also notes that although the morning announcement system in this case is best considered a nonpublic forum for the purposes of First Amendment analysis, describing Skyline's

system of student clubs generally as a "limited open forum" in this statutory context is not inconsistent. The EAA defines "limited open forum" differently than First Amendment doctrine uses the term, and "Congress' deliberate choice to use a different term – and to define that term – can only mean that it intended to establish a standard different from the one established by our free speech cases." *Mergens*, 496 U.S. at 242. Cases applying the EAA use the term more broadly than it is used in the First Amendment context. *See, e.g.*, *Colin ex rel. Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135, 1143 (C.D. Cal. 2000).

Turning now to the parties' arguments, Defendants argue that the announcements occur during "instructional" time – also known as during second period classes – which are after "classroom instruction begins" and "before" it ends. Therefore, say Defendants, the Act does not apply. However, good reasons exist to think that the time the announcements occur is not conclusive on the issue. In interpreting the phrase "noninstructional time" to include a scheduled "activity period" during the school day, the Third Circuit noted that "[t]he very phrases 'noninstructional time' and 'actual classroom instruction' demonstrate that there may very well be times in the scheduled school day during

which students would not be receiving 'actual classroom instruction.'"
*Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 222 (3d Cir.
2003).  Defendants cite *Prince v. Jacoby*, 303 F.3d 1074, 1088 (9th Cir.
2002), a decision that found that a scheduled "student/staff time" was a
scheduled class where attendance was taken and was therefore
instructional time, even though students could participate in club
meetings during that time.  *Id.* at 1087.  *Jacoby* thus "stands for the
proposition that mere mandatory attendance marks the beginning of
actual classroom instruction."  *Donovan*, 336 F.3d at 222.  Defendants
cite it for that same proposition.  ECF No. 74, PageID.2172 ("taking
student attendance, as required during 2nd period at Skyline before
announcements are read, indicates the beginning of instructional
time").

     The Third Circuit, however, rejected *Jacoby*'s reasoning and found
it more convincing that "mandatory attendance" is not the controlling
requirement, because Congress could have simply said that
noninstructional time occurs "before or after classes," but instead used
the narrower phrase "actual classroom instruction."  *Donovan*, 336 F.3d
at 224.  In *Donovan*, the scheduled activity period at issue was

"sandwiched between definite periods of 'actual classroom instruction'" and the court found that it was thus noninstructional time. *Donovan*, 336 F.3d at 223. Lunch period, for example, has been also held to be noninstructional time, although attendance is "mandatory" in the same sense that attendance is required during any school period. *See Ceniceros v. Bd. of Trustees of the San Diego Unified Sch. Dist.*, 106 F.3d 878, 880 (9th Cir. 1996). Admittedly, neither of those cases appears to involve a short period, as here, that is "nested" within a true instructional class period. However, here six minutes are added to Skyline's second period classes to account for the announcements. ECF No. 64-9, PageID.982 (Skyline Bell Schedule). That weighs in favor of counting those six minutes as noninstructional time (whatever moment they occur at), because classroom instruction is paused during announcements. *See* Plaintiffs' Ex. 11, ECF No. 65-12 (submitted as a media file exhibit). The period, however short, is "sandwiched" in practice between "actual classroom instruction." To the extent that "attendance" of announcements is mandatory, attendance was also mandatory during the lunch period and activity period in *Ceniceros* and *Donovan*. Although all students must listen to announcements for all

student clubs, even those they are not a member of, that is functionally no different from how the EAA covers access to yearbooks, and the result that all student clubs participating in yearbook pictures must implicitly accept that the other clubs will be featured in the final product as well. *See Colin ex rel. Colin*, 83 F. Supp. 2d at 1147 (C.D. Cal. 2000).

In reply, Defendants cite McElmeel's deposition to say that his testimony constitutes unrebutted evidence that the announcements are instructional time. ECF No. 74, PageID.2172 (citing ECF No. 64-4, PageID.845-846) ("Our pupil accounting office is well apprised on what counts as instructional minutes . . . so they are submitting our times and our schedules based on state allocations for instructional minutes and they are aware that all announcements occur during instructional time . . . ."). But all that testimony tends to prove is that the school counts the time as "instructional" under its interpretation of state law. Even assuming that interpretation is correct, the EAA would preempt that definition. *Donovan*, 336 F.3d at 224 (3d Cir. 2003) (Although "the state's interpretation of the broad phrase 'instructional time' by definition is much more inclusive than the EAA's restrictive

measurement of 'actual classroom instruction' . . . it is not controlling. The Supremacy Clause establishes that, for the purposes of EAA application, state law cannot be used to frustrate application of federal law.").

The court also notes the consensus of cases that state (though without detailed analysis) that the EAA guarantees access to a school's public address system, and apparently assume that any announcements made over that system are inherently "noninstructional" time. *See Straights and Gays for Equal. v. Osseo Area Schs. Dist. No. 279*, 471 F.3d 908, 913 (8th Cir. 2006) (under EAA, student gay rights group "entitled to the same avenues of communication" as other noncurriculum student groups, including access to the public address system); *Boyd Cty. High Sch. Gay Straight All. v. Bd. of Educ.*, 258 F. Supp. 2d 667, 693 (E.D. Ky. 2003) (granting injunction for the Gay Straight Alliance "to submit announcements about schedule changes and events to be read over the loudspeaker during home room"); *Colin ex rel. Colin*, 83 F. Supp. 2d at 1147 ("Once recognized, student groups are permitted to . . . make announcements over the public address system"); *ALIVE*, 2007 U.S. Dist. LEXIS 65326 at *18 (E.D. Mich. Sep.

5, 2007) (entering injunction for group to "have announcements broadcast over the school's internal television network"); *Chandler v. James*, 998 F. Supp. 1255, 1274 (M.D. Ala. 1997) (noting that the EAA would allow "making announcements over the school public-address system regarding meetings of noncurricular religious clubs"). The court sees no reason to throw a wrench into that mix. A school could, like AAPS' alternative high school, elect to close its announcements to submissions by any student groups, rendering the EAA inapplicable to their announcements. But once a school has opened its announcements to submissions by student clubs, it must guarantee access on equal footing under the EAA.

Ultimately, however, Plaintiffs cannot establish that they were denied equal access to the forum "on the basis of" the political content of their speech. As explained, the record reflects that the Skyline Republican Club was permitted to submit announcements under the same conditions as any other club, and the single time that Plaintiffs challenge Skyline's denial of an announcement, Defendants have shown that Skyline gave the same treatment to another group with an opposing political viewpoint on the same issue. This case shares

similarities with *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 466 (7th Cir. 2001). In that case, the school invited its student clubs to submit paint murals in the school's main hallway. The Bible Club submitted a sketch with a heart, two doves, an open Bible, and a cross. The principal allowed all of Bible Club's mural except the cross, on the basis that the symbol might invite an Establishment Clause challenge or, to prevent viewpoint discrimination, might require him to allow other clubs' symbols that would be disruptive (for example, a group of white supremacist skinheads petitioned to include a swastika on a mural – request denied). The Seventh Circuit found no violation of the Equal Access Act:

> Had the school [], while permitting the Bible Club to meet on school premises, forbidden it to announce its meetings or otherwise compete on equal terms with comparable but nonreligious student groups, it would have violated the Act. But there is no evidence of discrimination against the Bible Club. The principal forbade the inclusion of a large cross in the Club's mural because he was afraid that it might invite a lawsuit and incite ugly conflicts among the students. His reaction to the swastika, . . . shows that he was discriminating not against religion but merely against displays, religious or secular, that he reasonably believed likely to lead to litigation or disorder.

*Gernetzke*, 274 F.3d at 466 (internal citations omitted).

Although this case does not involve an Establishment Clause issue, the reasons for the administrators acting are analogous. Here, school administrators did not prevent the Republican Club from submitting announcements (nor generally prevent participation in the school) on equal terms as other clubs. Republican Club was not barred from making an announcement entirely about the election, only that they needed to edit their proposed text before it would be approved, consistent with school policy. The school's editing of NOW's announcement regarding Proposal 3 shows that they discriminated not against particular political viewpoints, but merely against the portions of announcements which they reasonably believed were likely to lead to the appearance of using district resources to advocate for or against ballot measures (a problem under the Michigan Campaign Finance Act) or disorder (by turning morning announcements into a politicized, school-sponsored bullhorn each election season, rather than enforcing a consistently neutral space to announce student club activities).

Defendant's motion is **GRANTED** as to Count IV.

> v.   *Monell Liability*

Somewhat obscured by Plaintiffs' motion for summary judgment is that Plaintiffs included claims against Bilsborrow and McElmeel in their official capacities, as well as against Ann Arbor Public Schools. These are properly understood to be one claim for municipal liability under *Monell v. Dep't of Socs. Servs.*, 436 U.S. 658 (1978). A plaintiff can succeed in proving municipal liability (or *Monell* claim) by "showing that the municipality had a 'policy or custom' that caused the violation of his rights." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citing *Monell*, 436 U.S. at 694). Claims brought against individuals in their official capacities are the equivalent of a claim brought against the municipal entity. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Accordingly, claims brought against McElmeel and Bilsborrow in their official capacities[58] are redundant with the claims brought against AAPS. *Doe v. Centreville Pub. Sch.*, No. 1:17-cv-317, 2019 U.S. Dist. LEXIS 234091, *15-16 (W.D. Mich. Apr. 29, 2019). A school district is

---

[58] McElmeel is no longer principal of Skyline High School, ECF No. 64-4, PageID.827-28, which requires dismissal of his official capacity claim – but as explained, the point is irrelevant where the claims against AAPS and Bilsborrow in his official capacity were redundant of that claim.

considered a municipality under *Monell*. *See Mt. Healthy City Sch.*
*Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-81 (1977); *Johnson v.*
*Mount Pleasant Pub. Sch.*, 745 F. Supp. 3d 479, 500 (E.D. Mich. 2024).

Plaintiffs' *Monell* claim is undeveloped in their briefings; their
own motion does not address the issue directly. To the extent that they
do raise a *Monell* claim, their arguments are scattered throughout their
briefing and statements of fact and are not meaningfully applied to the
facts of this case. *See Emerson v. Novartis Pharm Corp.*, 446 F. App'x
733, 736 (6th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955,
956 (7th Cir. 1991) ("'Judges are not like pigs, hunting for truffles' that
might be buried in the record.")). Their motion for summary judgment
is denied on that basis.

However, on cross motions for summary judgment, the question
for the court becomes not whether Plaintiffs have adequately explained
their theory of *Monell* liability, but whether Defendants have proven
entitlement to judgment on that claim. Here, that point is
straightforward. A lack of a constitutional violation or violation of
federal law is a complete defense to a *Monell* claim; a municipality
cannot be liable if their officers committed no violation in the first place.

*Roell v. Hamilton Cnty.*, 870 F.3d 471, 487 (6th Cir. 2017).  Because the court finds no constitutional violation and no violation of the Equal Access Act, that conclusively establishes that Defendants are entitled to summary judgment on Plaintiffs' claims against AAPS.[59]

## VI.   CONCLUSION

Therefore, the Court **GRANTS** Defendants' motion for summary judgment in full, and accordingly **DENIES** Plaintiffs' motion.

This opinion and order adjudges all claims in this case, is a final order, and closes the case.  A separate judgment will follow.

**SO ORDERED**.

Date: August 14, 2025          <u>s/F. Kay Behm</u>
                               F. Kay Behm
                               United States District Judge

---

[59] This includes the redundant claim against Bilsborrow in his official capacity.